UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

            -vs-                        18-CR-6091

ROBERT E. TILLARD,

                Defendant.
-------------------------------------


        Proceedings held before the

    Honorable Jonathan W. Feldman,

    Kenneth B. Keating Courthouse, 100 State

    Street, Rochester, New York, on

    December 12, 2018.


    APPEARANCES:

    KATELYN M. HARTFORD,
    Assistant United States Attorney,
    Appearing for the United States.

    SONYA A. ZOGHLIN,
    Assistant Federal Public Defender.
    Appearing for Defendant.

    AUDIO RECORDER:  Lisa Duque


    TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                     Court Reporter,
                     (716)332-3560


        (Proceedings recorded by electronic sound
        recording, transcript produced by computer.)

1                              I N D E X

2              WITNESS                              PAGE

3         PETER MINURKA

4    Direct Examination by Ms. Hartford              39

5

6

7         GOVERNMENT EXHIBITS                        EVD.

8         1, 1A, 1B, 2, 3, 4, 5

9                                                    39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE CLERK:  . . . Judge, Feldman

2    presiding.  You may be seated.  United States of

3    America versus Robert E. Tillard, 18-CR-6091-FPG.

4           THE COURT:  Good afternoon.  We're here

5    for a suppression hearing.  I believe the

6    suppression hearing has to do with statements?

7           MS. HARTFORD:  Yes, your Honor.  And for

8    the record, we are taking Officer Minurka's

9    testimony here today here somewhat out of order.

10   The defense filings were due and I received them on

11   Friday of last week.  The government's response is

12   not due until the 21st, with oral argument set at a

13   later date.  However, due to the fact that Officer

14   Minurka, who is the lead officer during this

15   traffic stop and on that day, is under military

16   orders beginning on January 9th and through mid

17   May, we decided to take his testimony first.  I'm

18   just stating that for the record.  So this won't be

19   the entire suppression hearing.  However, because

20   it was anticipated that this officer's testimony

21   would be an essential part of those hearings, we

22   are taking that today.

23       My understanding is that it is regarding

24   statements.  Based on Miss Zoghlin's filings, she's

25   also challenging any evidence of taint after the

1  traffic stop as fruit of the poisonous tree, I

2  believe.  Is that correct, Miss Zoghlin?

3          MS. ZOGHLIN:  It has to do with both

4  statements and the tangible evidence, specifically

5  marijuana.

6          THE COURT:  The marijuana was seized from

7  where?

8          MS. ZOGHLIN:  The allegation is it was

9  seized from his person.

10          THE COURT:  Okay.

11          MS. HARTFORD:  So I will also be asking

12  Officer Minurka about the circumstances leading to

13  the attempted traffic stop and ultimate arrest of

14  Mr. Tillard.

15          THE COURT:  Okay.  And when does

16  Officer Minurka --

17          MS. HARTFORD:  Minurka, M-I-N-U-R-K-A.

18          THE COURT:  When does he return from

19  military duty?

20          MS. HARTFORD:  Mid May, your Honor.

21          THE COURT:  Okay.

22          MS. HARTFORD:  His ship-out date I believe

23  is January 9th, which means that he will be

24  traveling to Georgia on January 8th.  I did inquire

25  with him as to his availability prior to then.  The

1   7th would be the absolute last date, but that is a

2   Monday.  So to the extent we could do it before

3   then, great.  But, of course, it's the government's

4   position that we'll do all today, but we'll see

5   what the Court decides.

6           THE COURT:  Okay.  Is there any objection

7   to taking the direct testimony of the officer

8   today?

9           MS. ZOGHLIN:  No, not the direct

10  testimony.

11          THE COURT:  Okay.  And were you planning

12  on asking him anything about these allegations in

13  cross-examination?

14          MS. ZOGHLIN:  Yes.  I would say

15  tentatively, yes, although I don't have all the

16  information.  So I think I need it to make a --

17          THE COURT:  Right.  I guess what I'm --

18  what I'm thinking is if you could -- if we had time

19  and you could start on your cross-examination, and

20  then I'd rule whether you would be able to continue

21  with specific documents.  I don't know what

22  documents you're still missing.  I guess we'd have

23  to get into that.

24          MS. ZOGHLIN:  Yes.  I could get into that

25  now.

1            THE COURT:  Okay.

2            MS. ZOGHLIN:  As the Court's aware, I did

3    send an email to Miss Hartford and with a copy to

4    the Court yesterday regarding some material that I

5    got very recently and some that I think I'm still

6    missing.  Specifically, yesterday I got some

7    documents from a professional standards -- RPD

8    professional standards section review regarding --

9    based on a complaint made by Mr. Tillard

10   specifically against Officer Minurka.  That

11   included several documents, including a lengthy

12   transcript of Officer Minurka's testimony.

13        Today I got a 50-page transcript of

14   Mr. Tillard's testimony.  I don't --

15           THE COURT:  Testimony was at a PSS

16   proceeding?

17           MS. ZOGHLIN:  Yes.

18           THE COURT:  Okay.  When was the complaint

19   made and when was the hearing?

20           MS. ZOGHLIN:  I can tell you that.

21   December 21st, 2017, appears to be the date of the

22   initial complaint.  Mr. Tillard received an update

23   on February 9th saying that the investigation was

24   still in process.  There was a hearing.

25   Mr. Tillard's testimony was December 21st, 2017,

1   and Officer Minurka's testimony --

2           MS. HARTFORD:  February 13th, 2018.

3           MS. ZOGHLIN:  February 13th, 2018.

4           THE COURT:  And when was the decision

5   rendered on the PSS complaint?

6           MS. ZOGHLIN:  I believe it was July 11th,

7   2018.

8           THE COURT:  And so you have the

9   complaint --

10          MS. ZOGHLIN:  I just got that today.

11          THE COURT:  Okay.  You have the hearing

12  testimony at least as far as both your client and

13  the officer?

14          MS. ZOGHLIN:  I do.  What I don't have

15  related to that is I'm not -- I don't know whether

16  it was videotaped.  I see a document indicating

17  that Mr. Tillard agreed that it could be

18  videotaped.  He is under the impression that it

19  was.  I don't know that for sure, and I don't have

20  that videotape.  And I also don't know what other

21  witnesses were called.

22          THE COURT:  Do you have a copy of the

23  decision that was rendered?

24          MS. ZOGHLIN:  I have a copy of a letter

25  that was mailed to Mr. Tillard.  I don't know the

1    extent of the paperwork that's -- that's generated

2    based on this complaint.  It's clear to me that

3    there's more.  I don't know what more.  But I do

4    have a letter that was sent to him.

5         THE COURT:  Was Mr. Tillard present when

6    the officer testified?

7         MS. ZOGHLIN:  No.

8         THE COURT:  Okay.  Do you know if either

9    of those testimonies were videotaped?

10        MS. HARTFORD:  I don't know, your Honor.

11   I'm not in possession of video recorded testimony

12   for either.  I am familiar with what Ms. Zoghlin is

13   saying in that I read -- I think it was in the

14   transcript -- I don't know if it was in the

15   transcript or in the advisement that is given to

16   the witnesses ahead of time asking if they would

17   consent to videotape.  So to answer your question,

18   your Honor, I don't know if it was taped.  If it

19   was taped, I'm not in possession of those

20   recordings.  However, full transcripts of both the

21   defendant's testimony and the witness who's to

22   testify today, Officer Peter Minurka's testimony,

23   have been provided to the defense.

24        THE COURT:  Who represents the parties at

25   these hearings?

1          MS. HARTFORD:   Officer Minurka did have

2     representation.  I don't know who it was, if it's a

3     union rep or an attorney, and I'm not familiar with

4     Mr. Tillard's representation at that time.

5          MS. ZOGHLIN:  My understanding is he had

6     none.  Certainly wouldn't have happened I think if

7     an attorney was aware of it.

8          THE COURT:  Yeah.  Who did the questioning

9     then?

10         MS. ZOGHLIN:  The RPD sergeants.  The one

11    of Mr. Tillard was Sergeant Laszlo Tordai and

12    Sergeant John Drew.

13         THE COURT:  And who is the -- are they the

14    adjudicators or are they the judges?

15         MS. ZOGHLIN:  I don't know.  I do know

16    that -- well, a couple other things.  From reading

17    the transcript it's clear -- several things are

18    clear.  One is that there are also notes that were

19    taken, because there was an interview done with

20    Mr. Tillard before an interview that was on the

21    record.  I don't have anything about that.  I just

22    know that from reading the transcript and having

23    the questioner refer to notes.  The questioner also

24    refers to photographs that he took that I don't

25    have.

1          THE COURT:  And do you have the whole PSS

2     file?

3          MS. HARTFORD:  I was under the impression

4     that I had the whole PSS file, your Honor.  I

5     received it on Monday of this week.  I did notice

6     as I was reviewing it and trying to prepare for

7     this hearing at the same time, but I did notice

8     that it mentioned the possibility that the hearing

9     could be recorded, and I don't have those

10    recordings.  I did notice -- I don't believe that I

11    have the photographs, but I'm not sure, your Honor,

12    my review, I was trying to identify any statements

13    of the defendant and get those to the defense as

14    soon as possible, as well as any Jencks in advance

15    of today's hearing.  So it was kind of triage in

16    trying to get those materials to the defense in a

17    timely manner.  As far as doing a detailed review

18    of the file, I have not been able to do that at

19    this time.

20         THE COURT:  The hearing that was conducted

21    deals with the relationship between the officer and

22    Mr. Tillard?

23         MS. HARTFORD:  Yes.

24         THE COURT:  Is there any question in your

25    mind that it would be relevant in terms of

1  impeachment evidence or Giglio material or Brady --

2  or potential Brady material?

3  MS. HARTFORD:  Your Honor, I believe first

4  and foremost that it does not constitute Brady

5  material.  I also don't believe that it constitutes

6  Giglio material.  To the extent that these are

7  prior separate interactions, it may explain their

8  prior relationship.  But as far as -- I haven't

9  seen anything that I believe would go to Brady or

10  Giglio.

11  THE COURT:  Would it at all implicate the

12  officer's motive for interacting with Mr. Tillard?

13  MS. HARTFORD:  There could be -- not in

14  what I've seen.  I'm sure the defense would argue

15  that.  So to the extent that that's an issue that

16  the parties disagree with, I would ask for the

17  Court to conduct an in camera review of the

18  materials and make that determination.

19  There is a law, a New York State Civil Rights

20  Law 50-a which in state court governs the

21  dissemination of this information.  It's unclear

22  whether that applies in federal court or not.

23  However, in a brief review of the case notes,

24  following that there was a case out of the Southern

25  District of New York that said while it may or may

1    not apply, the federal courts typically will try to

2    honor the purposes, and I would ask --

3            THE COURT:  That is the correct view of

4    the case law.

5            MS. HARTFORD:  Okay.

6            THE COURT:  However, that case law I

7    believe is probably with respect to civil rights

8    cases, civil cases.

9            MS. HARTFORD:  Yes, your Honor.

10           THE COURT:  So, I haven't had a 50-a issue

11   in a criminal case.  My initial reaction is that

12   that privilege as it's known, the 50-a privilege

13   would not the trump the constitution.  In other

14   words --

15           MS. HARTFORD:  I would agree.

16           THE COURT:  -- if this material is

17   determined to be Brady or Giglio material, that the

18   CPLR or whatever the 50-a, I think it's the state

19   civil rights law -- I forget what section of the

20   law it is -- that that would not control or trump

21   the constitution if the material has to be turned

22   over.  It seems to me though that the state

23   authorities are not balking at giving you access to

24   whatever material they have.  Is that true?

25           MS. HARTFORD:  That's correct, and I think

1    that that is partially because -- I had to file a

2    written request with certain language, of course.

3    And it may be because in 50-a it says that the

4    provisions of the section don't apply to any

5    district attorney, attorney general.  It obviously

6    doesn't address the federal prosecution, but maybe

7    that's where that came from.  But again, I don't --

8    I would feel most comfortable with the Court

9    conducting it if your Honor believes that it's

10   possible that there's Giglio material, which I

11   haven't heard the defense articulate a specific

12   basis of material that they're looking for.  Just

13   sounds more like they want blanket everything to

14   see if they can find anything, almost more akin to

15   a fishing expedition.  But I would be comfortable

16   with the Court reviewing these documents in camera

17   to weigh the state's interests with the defendant's

18   constitutional interests and make that

19   determination independently.

20          THE COURT:  Well, let me ask this.

21   Everything you've had you turned over though,

22   correct?

23          MS. HARTFORD:  Not in the PSS file, your

24   Honor.

25          THE COURT:  Okay.  What has not been

1   turned over in the PSS file?  What types of

2   documents?

3           MS. HARTFORD:  There are statements made

4   by other officers, testimony made by other

5   officers.

6           THE COURT:  About their observations of

7   the interaction between the officer and

8   Mr. Tillard?

9           MS. HARTFORD:  I'm not sure, your Honor.

10  I haven't read their transcripts yet.

11          THE COURT:  Okay.

12          MS. HARTFORD:  There are internal

13  memoranda written by the people involved in the

14  decision-making process.  I haven't read those

15  either.  There is -- there is one section -- and I

16  have this with me, and I am prepared to turn this

17  over to the defense.  There's a section regarding

18  other incidents which has body camera footage and

19  reports.  Those are RPD documents that I could get

20  independently outside of the PSS process.  So to

21  the extent the defense is requesting those, again,

22  I don't think that they're relevant, because I

23  think that they are extrinsic to the case at hand.

24  I don't think that they go to truthfulness or bias,

25  and we can certainly ask the officer about that

1   during direct and cross, but it includes the
2   contents of this other incidents file that was in
3   the file that PSS gave me.  So just for the record,
4   I'll hand that to the defense now.  Those do exist
5   separate from the PSS file.  But generally that's
6   my -- my understanding of what is in there.

7       Also the memoranda that were issued to officers
8   Minurka and Giancursio detailing the findings which
9   I think also are summarized in this letter that was
10  sent to the defendant which I believe the defense
11  already has.  It was addressed to Mr. Tillard on
12  July 11th, 2018.  (Indiscernible).

13          MS. ZOGHLIN:  I do have that.

14          MS. HARTFORD:  Okay.  And I'll provide a
15  copy to the Court as well stating what was
16  substantiated, what was exonerated, et cetera.

17      My understanding as well, your Honor, some of
18  those documents underlying the findings would be
19  irrelevant, because once the officer is asked about
20  the one -- let's see, the one sustained complaint,
21  that is pertaining to use of body worn camera, his
22  answer is his answer.  Extrinsic proof I don't
23  think would be permitted to get into the result of
24  that.  That being said, I intend to ask him about
25  that on direct and expect him to say that it was

1   sustained and explain his understanding of that.

2          THE COURT:  Miss Zoghlin, do you want to

3   be heard on any of this?

4          MS. ZOGHLIN:  I do.

5          THE COURT:  Okay.

6          MS. ZOGHLIN:  I'll start first with the

7   last thing that Miss Hartford said.  I

8   fundamentally disagree with the notion that

9   extrinsic evidence would not be permitted and that

10  I would be bound by his answer, because the

11  questions go to -- directly to his credibility and

12  specifically to his bias.  And I do have a couple

13  examples of the Second Circuit reiterating the rule

14  that that type -- evidence that goes to those

15  issues is never collateral, and therefore extrinsic

16  evidence is admissible.

17     In terms of whether this is Brady or Giglio

18  material, what is in this transcript, in this

19  investigation is specifically about my client's

20  allegations that there was a pattern of harassment

21  starting approximately six months and culminating

22  in and including the arrest in this case.  It is,

23  in my mind, quite clearly relevant, and it is also

24  in my mind exculpatory, at least potentially

25  exculpatory, because it goes to the officer's

1   credibility, both in terms of his testimony and

2   what we would argue is a pattern of harassment, and

3   I think it's also relevant that the officer in his

4   testimony before the professional standards section

5   conceded that he had stopped Mr. Tillard

6   approximately seven times in the six months leading

7   up to his arrest.

8       He also conceded that he had texted Mr. Tillard

9   directly from the officer's cellphone to

10  Mr. Tillard's cellphone at least twice leading up

11  to this arrest.  He also --

12              THE COURT:  What did the text say?

13              MS. ZOGHLIN:  I'm sorry?

14              THE COURT:  What did the text say?

15              MS. ZOGHLIN:  The text said -- from my

16  memory, there's two of them.  They're not very --

17  there's not much substance.  There is I believe yo,

18  this is M, presumably from Minurka.  And another

19  one that said what's up, I believe.  Or something

20  to that effect.

21              THE COURT:  And they're from Minurka's

22  official phone?

23              MS. ZOGHLIN:  Personal cellphone.

24              THE COURT:  Personal cellphone or --

25              MS. ZOGHLIN:  Yes.

1          THE COURT:  Okay.

2          MS. ZOGHLIN:  Yes.  To my client's

3  personal cellphone.  And I don't believe my client

4  ever gave him the number or gave him permission

5  to --

6          THE COURT:  What phone is it from Minurka,

7  his personal cellphone?

8          MS. ZOGHLIN:  His personal cellphone, yes.

9          THE COURT:  Have those texts been

10  preserved?  Are you aware of those texts?

11          MS. HARTFORD:  They've been presented to

12  the defense, your Honor.

13          THE COURT:  Oh, you got them and presented

14  them to the defense?

15          MS. HARTFORD:  Yes.

16          THE COURT:  Pursuant to Brady?

17          MS. HARTFORD:  I did just because it was

18  statements of the officer and -- I don't think

19  Brady.  I don't think it's Brady, no.

20          THE COURT:  Why is he texting him on his

21  personal phone?

22          MS. HARTFORD:  As to why it's his own

23  personal phone?  You'd have to ask the officer.  I

24  don't know.

25          THE COURT:  You never asked the officer

1    why he's communicating with the defendant on his

2    personal phone?

3            MS. HARTFORD:  No.  I know that he was

4    trying to develop the defendant potentially as a

5    cooperator, or there was discussion that the

6    defendant would work as a cooperator --

7            THE COURT:  Okay.

8            MS. HARTFORD:  -- is my understanding,

9    without classifying whether he agreed or when he

10   agreed.  Because it sounds like the defense's

11   version of it is not what Officer Minurka's

12   understanding was.

13           THE COURT:  And is that common to use your

14   personal phone?  Is that part of Rochester Police

15   Department protocol to use --

16           MS. HARTFORD:  I don't know, your Honor.

17   I do know that that came up in Officer Minurka's

18   testimony in front of PSS.

19           MS. ZOGHLIN:  I believe the implication

20   that I got from reading that testimony in the

21   questioning was that the personnel -- the RPD

22   personnel who asked the question were surprised by

23   that answer, and assumed I think and asked a

24   question something to the effect of was that on

25   your snitch phone issued by the RPD, and he said

1  no, it was his personal cellphone.

2          MS. HARTFORD:  I'm not sure if

3  Officer Minurka has an RPD phone.  I don't know the

4  answer to that.

5          THE COURT:  These the only two texts

6  between these two parties?

7          MS. ZOGHLIN:  As far as I know, Judge,

8  yes.

9          THE COURT:  Did your client respond to the

10  text?

11          MS. ZOGHLIN:  He did not.  In fact, my

12  understanding is he changed his number so that he

13  wouldn't be contacted.  But I would have to talk to

14  him again to make sure I have the details correct.

15          THE COURT:  Okay.

16          MS. ZOGHLIN:  The other issue in terms of

17  why it's -- I perceive it to be Brady and Giglio is

18  that the officer was specifically asked in the

19  professional -- what is it called?  Professional

20  standards section review basically about how he

21  felt about the situation.  And he specifically said

22  I don't take kindly to it.  I felt like -- I'm

23  upset that -- in terms of the situation it means

24  having been accused of these things.  And he

25  essentially says that he's upset.  He didn't take

1    kindly to it.  He felt -- I felt personally -- he

2    didn't finish that sentence.  I'm kind of upset

3    that I'm even here because this is -- because, you

4    know, this is outrageous, the allegations.

5        So, what I would submit along with what I

6    submit is a pattern of harassment and a bias

7    against Mr. Tillard is, if anything, the bias has

8    only increased since he's clearly indicated that he

9    was personally -- specifically personally outraged

10   that these allegations were made against him.  I do

11   think he has a particular motive in this case to

12   justify his behavior.

13       It's also clear from his testimony that they

14   had the specific dates on which he interacted with

15   Mr. Tillard.  He was able to say them by date.  He

16   also referred to having reviewed the paperwork and

17   at least one instant having reviewed the body worn

18   camera of those previous incidents.  So as I

19   referenced in my email to Miss Hartford that was

20   copied to the Court, I'm also asking for the

21   paperwork that -- regarding those incidents.

22            THE COURT:  So the defendant's complaint

23   made to PSS was in December of 2017.  And the

24   arrest was February of 2017?

25            MS. ZOGHLIN:  Yes, February 25th, 2017.

1              THE COURT:  The arrest occurred well

2      before the complaint occurred?

3              MS. ZOGHLIN:  Yes.  They actually ask

4      Mr. Tillard about that in his testimony.

5              THE COURT:  When did these other six

6      incidents occur?  What was the period of time?

7              MS. HARTFORD:  Prior to the arrest, your

8      Honor.

9              MS. ZOGHLIN:  The -- starting August 15th,

10     2016, October 3rd, 2016, November 2nd, 2016.  Text

11     messages on November 22nd, 2016, and I believe

12     November 4th.  Another interaction where he stopped

13     Mr. Tillard, November 9th, 2016, November 25th,

14     2016, December 19th, 2016, February 24th, 2017.  In

15     other words the day before this incident.  And then

16     this incident which was December -- I'm sorry,

17     February 25th, 2017.  So it is approximately the

18     preceding six months.

19             THE COURT:  And the allegation here is

20     that the defendant was stopped for the infamous

21     failure to signal a hundred feet before a turn?

22             MS. HARTFORD:  He failed to signal a

23     hundred feet before the turn, and he also was

24     driving with a driver's permit, not a driver's

25     license.

1          THE COURT:  He wouldn't know that until

2     after the stop was made, though.

3          MS. HARTFORD:   Officer Minurka knew that

4     because of the stop the day before when he gave him

5     his driver's permit.

6          THE COURT:  What was the stop the day

7     before for?

8          MS. HARTFORD:  I'd have to double check,

9     your Honor.  I believe it was odor of marijuana,

10    but I'd have to double check.  Because, as

11    Ms. Zoghlin stated, there was a number of

12    interactions.

13         MS. ZOGHLIN:  Judge, if we could just go

14    back for a moment to the discussion of the decision

15    that my client received.  The decision is that

16    three allegations were unfounded or some form of

17    unfounded -- unfounded, exonerated, and unprovable.

18    But it also contains this paragraph.  As part of

19    the session, a satellite issue was identified

20    pertaining to body worn camera usage by Officers

21    Minurka and Giancursio.  The finding for the

22    satellite issue is sustained, which indicates that

23    it has been determined that the alleged act

24    occurred amounting to misconduct or misjudgment on

25    the part of the officer.

1    That's the entirety of the information we have

2    about the decision and what led to the decision.

3    So clearly there are -- I'm sure there's other

4    evidence, memos --

5             THE COURT:  Is that in the PSS file?

6             MS. HARTFORD:  Yes, your Honor, but I

7    don't think that the defense is entitled to that.

8    I don't think that it's relevant.  I think that the

9    fact that he didn't use his body worn camera

10   properly, by the way, about 30 days or less after

11   it was first issued to him and had received minimal

12   to no training on it, he made a mistake as to how

13   and when to turn it on, doesn't go to bias, doesn't

14   go to truthfulness.  I'm going to bring it up with

15   him on direct.  It was a -- like a counseling

16   statement or a training statement essentially

17   saying you violated a policy and you need to read

18   up on the policy, and failure to do this correctly

19   in the future could result in disciplinary action.

20   That's essentially what it was.

21            THE COURT:  Okay.  Well, we'll see what

22   the cross-examination is on that and then I can

23   make a ruling as to whether any of the documents

24   would be producible.

25            MS. ZOGHLIN:  Judge, are you talking about

1   cross examining now?  Because I'm -- there are a
2   lot of documents that I feel would influence how I
3   structure my cross and what I ask on cross.
4   Clearly we know what he's going to answer.  But
5   this issue with the body worn camera is -- I don't
6   know how far back it goes.  I don't know how many
7   incidents there are.  I don't think I should be
8   bound by his answer.  There's been a specific
9   finding of either misconduct or misjudgment, and,
10  frankly, I don't think I should be bound by his
11  answer or Miss Hartford's summary of what she
12  believes these documents mean and how -- and
13  whether they're relevant.  The body worn camera
14  issue also includes the arrest here, where
15  specifically --
16          THE COURT:  So the body worn issue was
17  failure to turn on the body worn for this arrest
18  here?
19          MS. HARTFORD:  That was my understanding,
20  your Honor.  Again, I haven't done an in-depth
21  review of the whole PSS file at this time.  I don't
22  know if it was just this day or other days.  But I
23  did ask Officer Minurka if he's had any other
24  complaints, even, recording body worn camera since
25  then, and he indicated no complaints or obviously

1    findings since that incident.  And again, this was

2    30 days after he received the body worn camera, so

3    certainly --

4            MS. ZOGHLIN:  Certainly he's --

5            MS. HARTFORD:  I'm sorry, may I finish?

6    Thank you, your Honor.  So certainly not a lot of

7    time passed prior to that either, so --

8            THE COURT:  But I could see a situation

9    where cross-examination could center on whether he

10   didn't turn the body worn camera on because he

11   wasn't trained or because he didn't want to record

12   what was being said between him and the defendant.

13           MS. HARTFORD:  And certainly those

14   questions can be asked.

15           THE COURT:  It could be asked, but it

16   would be interesting to know what the PSS found in

17   it.

18           MS. HARTFORD:  Okay.

19           THE COURT:  I think with respect to the

20   interaction between the defendant and Minurka on

21   the day of the arrest, that any PSS investigation

22   regarding that should be turned over.  With respect

23   to other incidents, I guess I need more

24   information.

25           MS. ZOGHLIN:  In part, of course, that's a

1  Catch 22 for me, because I don't have the

2  information.  But he should have been -- his body

3  camera should have been on on every one of these

4  previous interactions.

5      THE COURT:  But let's say they weren't on

6  at a previous interaction.  How does that help you

7  in this case?

8      MS. ZOGHLIN:  Because this is -- the

9  allegation is there is a pattern of harassment

10  leading up to this, and that the allegations here

11  against Mr. Tillard were made in response to their

12  previous interactions.

13      THE COURT:  No, no.  I guess if it was

14  with respect to a different defendant, would you

15  care if the body worn camera wasn't on?

16      MS. ZOGHLIN:  I would, because -- well, I

17  can --

18      THE COURT:  Wouldn't you just rather have

19  him not turn the body worn camera on when he

20  interacts with your client and turn it on for

21  everybody else, wouldn't that be better for you?

22      MS. ZOGHLIN:  Well, Judge, I don't know,

23  because I don't have the information.  But if, for

24  example, there is a pattern of him --

25      THE COURT:  Wouldn't it be great for the

1    government if he didn't turn it on for everybody,

2    he's not singling out your client?

3         MS. ZOGHLIN:  It may or may not.  We know

4    actually that he did turn it on during one of the

5    previous incidents.  So clearly, even though it's

6    brand new and he doesn't know anything about it, he

7    was able to turn it on before.  And I don't --

8         THE COURT:  I'd need a better argument as

9    to other defendants, what relevance it would be to

10   this case in terms of impeaching him in this case

11   as to whether he turned the body worn camera on.

12        MS. ZOGHLIN:  Sure.  I can conceive of --

13   you know, I don't know the whole world of

14   possibilities.  But if, for example, there was some

15   pattern of him saying oops, I forgot to turn on my

16   body cam during times when it was critical that the

17   body cam be on and yet other times it wasn't, that

18   that would be relevant, whether it's Mr. Tillard or

19   anybody else.  For example, in Mr. Tillard's case,

20   he doesn't turn his body camera on at all during

21   the pursuit -- when the traffic stop was initiated,

22   during the pursuit, or when he actually

23   interrogated him in the police car and didn't turn

24   it on.  He then -- after Mr. Tillard's released

25   from state custody and the federal complaint is

1   filed, Officer Minurka is the one that goes and

2   arrests him.  Body cam's on the whole time.  I

3   think that's very relevant.  I think if that's his

4   pattern with other people, that's relevant also.

5       And to the extent that he turned on the body

6   cam in the seven incidents leading up to this, I

7   think their interaction is also very relevant.  My

8   assertion is that Officer Minurka has a bias

9   against Mr. Tillard, and that that led to what are

10  false accusations here.

11      The other issue I would say is what's the down

12  side to -- why shouldn't we know this?

13          THE COURT:  Um-hum.  Well, if it was a

14  civil discovery case I guess I'd probably agree

15  with you.  But ironically, unfortunately, in

16  criminal cases discovery is very limited under

17  Rule 16 and constitution issues such as Brady.

18      But let me ask, how many of these previous

19  incidents involving the body wire cam involve

20  Mr. Tillard?

21          MS. HARTFORD:  What do you mean, your

22  Honor?

23          THE COURT:  In other words, with the seven

24  incidents that he had with Officer Minurka, was

25  there a body cam each of those seven incidents?

1          MS. HARTFORD:  So again, Officer Minurka

2     had only received the body camera within 30 days of

3     this incident.

4          THE COURT:  Are there any incidents --

5          MS. HARTFORD:  Miss Zoghlin, where were

6     you getting those dates from, the transcript?

7          MS. ZOGHLIN:  Yes.  From Officer Minurka's

8     testimony --

9          MS. HARTFORD:  Where was that?

10          MS. ZOGHLIN:  -- the transcript.  The

11     dates are throughout.  He goes --

12          MS. HARTFORD:  They're throughout.  I'm

13     sorry, your Honor, I wasn't --

14          THE COURT:  But what I'm getting at --

15          MS. HARTFORD:  I think that most of those

16     interactions were outside of the time when he had a

17     body camera.

18          THE COURT:  To the extent that he

19     interacted with Mr. Tillard while he had been

20     issued a body camera, I think the body camera tape

21     should be turned over.

22          MS. HARTFORD:  And, your Honor, I believe

23     that I have turned that over to the defense,

24     because to my knowledge it was the -- I'm sorry,

25     one of them I had not been in possession of until

1    the PSS.  And it's on the disc that I turned over.

2    That was the day prior to the arrest.  The other

3    was the date of his federal arrest, which I had

4    previously turned over to the defense, which is

5    also incidentally on the PSS file.  It's

6    represented to me that all the relevant body camera

7    footage is in the file on the disc that I turned

8    over to the defense today in court.

9              THE COURT:  So to the extent there's any

10   body wire camera footage involving any incident

11   between the defendant and Officer Minurka, that

12   either has or will be turned over to the defense?

13             MS. HARTFORD:  Yes, your Honor.  And this

14   raises another point that I think it's important to

15   note as the defense is asking the day before the

16   suppression hearing for an adjournment for the

17   purpose of cross-examination, it is true that the

18   government provided Jencks material consisting of

19   Officer Minurka's testimony at PSS, in part, to the

20   defense yesterday morning, and that that would

21   reinforce things that the defendant and the defense

22   already knew, being that there were prior

23   interactions between the two of them, the dates

24   that that occurred, et cetera.  The defense has

25   known about this since the pendency of this case,

1    which, by the way, he was arrested quite some time

2    ago, March 2017, and they're able to obtain a lot

3    of these -- now the PSS file, I do recognize that

4    the government is somewhat differently situated

5    than the defense with regards to that. But as far

6    as requesting body camera, requesting police

7    reports, incident reports, the defense has been

8    able to request those documents from the police

9    department since prior time, and to request an

10   adjournment at this point I think is kind of a last

11   minute thing. Yes, they came up again in the

12   testimony, but this is information that isn't new

13   to the defense. And the fact that there was a body

14   camera complaint that was deemed sustained, the

15   defendant has known about since July. In fact, the

16   defendant knew about that before I knew about that.

17   So, not that the comparison is relevant, I'm sorry.

18   But it's just -- this isn't necessarily news, and

19   again, to the extent I can turn over what I'm in

20   possession of, I've done that today. And the

21   transcripts that were turned over -- that I have

22   turned over that are part of the PSS file are those

23   that I identified as Jencks material or relevant

24   because they're statements of the defendant.

25            MS. ZOGHLIN: Judge, may I respond to that

1   assertion about the timing?  I got that decision on

2   Monday.  The decision that was apparently mailed

3   out in July.  I was not aware of it until Monday of

4   this week.

5              THE COURT:  Your client didn't get it?

6              MS. ZOGHLIN:  I assume he got it, Judge.

7   But I wasn't aware of it.

8              MS. HARTFORD:  I didn't --

9              MS. ZOGHLIN:  If I could finish?

10             MS. HARTFORD:  Yep.

11             MS. ZOGHLIN:  The -- I think that's --

12  that argument has been pretty squarely addressed by

13  the Second Circuit.  And specifically there's a

14  case entitled United States versus Vinas,

15  V-I-N-A-S, which was decided in December of 2018,

16  in which the government argued that the defense

17  should have known about statements, because,

18  obviously, the defendant knew he made the

19  statements.  That argument was squarely rejected by

20  the Second Circuit.  So in terms of a suggestion

21  that I somehow was -- didn't follow up on this as

22  quickly as I should have and I should have gotten

23  subpoenas for it, they knew that they -- maybe they

24  didn't, but they should have known.  I got this

25  information -- I didn't know there was a

1    transcript.  I didn't know there was a videotape.

2    I didn't know that there was a finding.  So, that

3    is all new to me.  They should have known about it.

4    I got my client's 50-page transcript today.  So,

5    you know, I think that's, unfortunately, one of the

6    problems with taking things out of order -- and

7    which is why I'm requesting that we not do that.

8              THE COURT:  Okay.  So, let's do this

9    first.  Let's make sure the government contacts the

10   appropriate state officials to make sure you have

11   all the information regarding these PSS

12   investigations.  They've sent you the PSS file,

13   which is great, but we've heard information that

14   there may be videotape testimony or photographs or

15   any other information that was generated in the

16   course of the investigation.  So, I'd ask the

17   government just to confirm that you have

18   everything.

19       Once you're satisfied that you have everything,

20   I'd like you to go through it all and determine

21   what you want to withhold.  There may be

22   information in there which you have no objection to

23   releasing, either because you just don't object, or

24   you agree it could conceivably be Brady or Giglio

25   material or impeachment material or go to motive or

1   bias, and that should be turned over to the

2   defense.  Then, depending on the amount of

3   information left over, and I don't want to

4   volunteer in camera inspection if it's going to be

5   12 banker boxes of information, to the extent you

6   don't want to turn something over, I'd like you to

7   do something akin to a privilege log that we use in

8   civil cases, which is describe the information in a

9   way that defense counsel could understand what's

10  being withheld, who wrote it, what the subject

11  matter is, without revealing the substance of it,

12  provide that log to the defense, see if you can

13  agree that something is so tangential that it

14  doesn't need to be turned over.  And if there are

15  disagreements, the parties would submit that to me

16  for in camera inspection and determination.  It's

17  akin to what I do in civil cases, but I think it's

18  a procedure that would work well here in addition.

19      I would like to, as long as the officer is

20  here, have Miss Hartford call the officer and

21  proceed with the direct examination, because, quite

22  frankly, what's said on direct examination may help

23  my in camera review if I ever have do it.  And that

24  I would review -- I would rule on your request of

25  any disputed material before you were forced to

1   conduct a cross-examination, whether that would be

2   before January whatever it is that the witness is

3   leaving, or when the witness returns in May, I

4   can't guarantee that, because I don't know the

5   volume or how quickly you'll able to get the

6   information, or how quickly you'll be able to

7   review the log that the government's going to give

8   you.  I'm not as concerned about the delay here

9   because it's my understanding the defendant's out

10  of custody, is that true?

11          MS. ZOGHLIN:  Yes, it is.

12          THE COURT:  Okay.  So, I think that takes

13  a little pressure off of all the parties.  Is that

14  a procedure all parties can live with?

15          MS. ZOGHLIN:  Yes.

16          MS. HARTFORD:  Yes, your Honor.

17          THE COURT:  Okay.  So, let's not waste

18  anymore time.  Let's, if you're ready to bring

19  Officer Minurka in, and you can do your direct

20  examination.

21          MS. HARTFORD:  Yes.

22          THE COURT:  Cover whatever you want to

23  cover.  I'm not limiting you in terms of your

24  questions as to what you want to bring out,

25  including things that you may want to kick the wind

1    out of the sails.

2         MS. HARTFORD:  Sorry?

3         THE COURT:  Including any information you

4    may want to use to take kind of the wind out of the

5    sails in terms of any potential impeachment or bias

6    information.  You're free to question on whatever,

7    even things that have not been disclosed yet.

8         MS. HARTFORD:  Thank you, your Honor.  May

9    I just take a brief break before we begin?

10        THE COURT:  Absolutely.

11        MS. HARTFORD:  Thank you.

12        THE COURT:  Five minutes?

13        MS. HARTFORD:  That's more than enough

14   time.

15        THE COURT:  Okay.

16        MS. HARTFORD:  Thank you.

17        (Short recess was taken.)

18        THE CLERK:  . . . presiding.

19        MS. HARTFORD:  Your Honor, before we

20   begin, there's one point I want to mention that

21   came up in our discussion prior to the break.

22        THE COURT:  Yep.

23        MS. HARTFORD:  Ms. Zoghlin mentioned two

24   text messages from Officer Minurka to the

25   defendant, and I stated I thought I provided those

1   to her.  I noticed she was looking around in her

2   materials as if I hadn't.  So I just talked to her

3   about it during the break, and she's not sure if I

4   provided it, and I'm not -- actually not sure if I

5   provided it, because it was a one-page thing.  So I

6   just want it to be clear on the record about that.

7   I don't recall.  I'll make sure that she has it.  I

8   mean, she does have it, but I'll make sure that I

9   provide the version that I have to her this

10  afternoon after the hearing.  But her recollection

11  of what the messages constitute is my understanding

12  as well.

13          THE COURT:  Okay.  Great.  All right.

14  Whenever you're ready, let me know, and we'll get

15  started.

16          MS. HARTFORD:  Thank you, your Honor.  The

17  government calls Officer Peter Minurka.

18          THE CLERK:  Raise your right hand.

19  P E T E R   M I N U R K A, having been duly sworn as

20  a witness, testified as follows:

21          THE CLERK:  Thank you.  If you'll take a

22  seat in the witness stand.  State your name and

23  spell your last name for the record.

24          THE WITNESS:  First name is Peter.  Last

25  name is Minurka, M-I-N-U-R-K-A.

1          THE COURT:  All right.  You may proceed.

2          MS. HARTFORD:  Thank you, your Honor.  And

3    before we get started, just for the record, I do

4    have a number of exhibits.  I did show them to the

5    defense beforehand and don't anticipate any

6    objections, but we'll still go through proper

7    procedure.

8          THE COURT:  I have no objection if the

9    defense consents to just submit them now and you

10   can just use them freely.

11         MS. ZOGHLIN:  That's fine.

12         THE COURT:  Okay.  So what numbers are

13   they?

14         MS. HARTFORD:  It's Exhibits 1, 1A, 1B,

15   and then, 2, 3, 4, and 5.

16         THE COURT:  Those exhibits are received in

17   evidence for the purposes of the hearing.

18         MS. HARTFORD:  Thank you.

19         (Government's Exhibits 1, 1A, 1B, 2, 3, 4,

20         5 were received into evidence.)

21   DIRECT EXAMINATION BY MS. HARTFORD:

22   Q.  Good afternoon, Officer.

23   A.  Good afternoon.

24   Q.  Could you please state your name?

25   A.  Yes.  First name is Peter.  Last name is

1    Minurka.

2    Q.   And where are you employed?

3    A.   The Rochester Police Department.

4    Q.   How long have you been employed with the

5    Rochester Police Department?

6    A.   Approximately five years.

7    Q.   And what is your job there?

8    A.   As a police officer.

9    Q.   Patrol officer?  Are you with any special unit?

10   A.   Specifically I'm a patrol officer.  I'm

11   assigned to Genesee Section fourth platoon.

12   Q.   And did you receive any training in order to

13   become a police officer?

14   A.   I did.

15   Q.   And what was that training?

16   A.   Initial training began with the six-month

17   academy, followed by four months of field training.

18   Q.   And did you receive any training in New York

19   State Vehicle and Traffic Law?

20   A.   I did.

21   Q.   When was that?

22   A.   During the police academy.

23   Q.   So that would have been in the beginning of

24   your employment?

25   A.   Yes, ma'am.

1     Q.   Or prior to I guess, I'm sorry.

2     A.   Yes.

3     Q.   What did you do before you were employed with

4     the Rochester Police Department?

5     A.   I worked for the Monroe County Sheriff's

6     Office, jail bureau.

7     Q.   And how long did you work with the jail bureau?

8     A.   Approximately one year.

9     Q.   I'd like to direct your attention to

10    February 25th of 2017.  Were you employed with RPD

11    at that time?

12    A.   I was.

13    Q.   And were you a patrol officer -- did you say

14    Genesee division -- could you repeat that again?

15    A.   Yes.  I was working as patrol officer, Genesee

16    Section.  During that time I was actually assigned

17    to third platoon.

18    Q.   And what does that mean?

19    A.   That means I work from the hours of 3:00 p.m.

20    to 11:00 p.m.

21    Q.   And on February 25th of 2017, do you recall

22    becoming involved in an incident involving the

23    defendant Robert Tillard?

24    A.   I do.

25    Q.   And how did that come about on that date?

1    A.   During that time I was working with Officer

2    Giancursio who works with the Rochester Police

3    Department as well.  We were working as a two-badge

4    unit.  I was driving, he was in the passenger seat.

5    During that time we were in the area of South

6    Plymouth, Edith Street.  It's in the southwest

7    quadrant of Genesee Section.  I directed my

8    attention to a nearby intersection, South Plymouth

9    and Doran, when I observed a tan Toyota Camry.

10   Q.   Approximately what time of day was this?

11   A.   Approximately 10:41 p.m.

12   Q.   And what was the lighting and visibility

13   conditions like on that day at that time?

14   A.   At that time it was dark and it was poor light

15   conditions on that side of the street.

16   Q.   Showing you what's previously been marked as

17   Government Exhibit 1, are you able to -- if you

18   touch the screen, it should make a mark.  Are you

19   able to point to where you were at the time?

20   A.   Yes.  As soon as I find -- okay.  I was right

21   here.

22   Q.   All right.  It's not making -- there it works.

23   So there's a red dot at the corner of Doran Street

24   and what's that street --

25   A.   Edith.  So, if I tap on it, will it go back a

1    little bit further?

2    Q.   I'll clear it for you.

3    A.   Okay.  So more specifically I was right there.

4    Q.   So that would be on --

5    A.   On Edith.

6    Q.   On Edith Street.  Okay.  And please describe

7    what you saw.

8    A.   Okay, during that time?

9    Q.   Yes.

10   A.   I saw a tan Toyota Camry parked in this area

11   here.

12   Q.   Farther down Doran Street?

13   A.   Farther down Doran Street.  It was on the south

14   curb facing eastbound.

15   Q.   Okay.  Go ahead.

16   A.   During that time a male black exited the

17   driver's side of that Toyota Camry.  He was wearing

18   a black leather jacket, and appeared that he was

19   holding something in his hand as he was walking

20   towards the store at 700 South Plymouth, which is

21   that parking lot, if you continue to work north.

22   Q.   Is that on this map?

23   A.   You cannot see it.  It's kind of cut off.

24   Q.   Okay.  Can you put a dot where that would be if

25   the map were to continue?

1    A.   About right there.

2    Q.   So is it fair to say the north side of Doran

3    Street just slightly off the map, the corner --

4    A.   The northeast corner of Doran and South

5    Plymouth, yes.

6    Q.   Okay.  Perfect.  Go ahead.  So he was walking

7    in that direction?

8    A.   Walking in that direction.  Short time later

9    before he made it all the way across the street, he

10   just kind of turned around and walked right back to

11   that Toyota Camry and entered the driver's seat.

12   Q.   All right.  And what happened next?

13   A.   At that point he pulled away from the curb at a

14   pretty high rate of speed.  At that time I -- right

15   around the time he pulled away, I actually turned

16   to go the opposite direction westbound on Doran

17   Street, so that we were actually driving in

18   opposite directions passed each other.

19   Q.   You were driving westbound on Doran Street and

20   this individual was driving eastbound on Doran

21   Street?

22   A.   Correct.

23   Q.   Were you able at some point to see who the

24   driver was?

25   A.   I was.

1    Q.   And what did you see?

2    A.   At that point I was able to turn to see the

3    driver's face, identified him as Robert Tillard,

4    who I've known in previous encounters.

5    Q.   Were you able to see if there was anybody in

6    the passenger seat?

7    A.   Not at that time I did not.

8    Q.   And did you know at that time whether

9    Mr. Tillard had a valid driver's license or not?

10   A.   I was aware, yes.

11   Q.   And what's the answer to that?

12   A.   He had a New York State permit only.

13   Q.   How did you know that?

14   A.   Actually, the day before that I just conducted

15   a traffic stop and ran his driver's license,

16   determined so.

17   Q.   And you determined at that time the day before

18   he only had a New York State learner's permit?

19   A.   Yes, ma'am.

20   Q.   So what happened next?

21   A.   So he proceeded to -- I believe once he saw my

22   vehicle, he --

23            MS. ZOGHLIN:   Objection.

24            THE COURT:   You can only testify to what

25   you did, not what somebody else may have thought.

1          THE WITNESS:  Okay.  Sorry.  He began to

2     travel at what I believe to be a high rate of speed

3     based on the distance that he had traveled from

4     that -- that curb to the end on Doran towards

5     Exchange.  I then turned down southbound on

6     Plymouth to try to circle back around the

7     neighborhood to try to reacquire the vehicle coming

8     out of Exchange Street.

9     BY MS. HARTFORD:

10    Q.  And were you able -- when you say reacquire the

11    vehicle, does that mean catch up with the vehicle?

12    A.  Yes.  Because I lost sight of it for a slight

13    time.

14    Q.  Okay.  Were you able to catch up with that

15    vehicle?

16    A.  I was.

17    Q.  Where were you -- can you draw a line on the

18    screen kind of the path that you took?

19    A.  Yep.  I went south on Plymouth, back eastbound

20    on Violetta, to Exchange.

21    Q.  Okay.  And at that point did you see the

22    vehicle that you saw Mr. Tillard driving?

23    A.  I did.

24    Q.  Where was it going?

25    A.  It was driving south on Exchange Street.

1    Q.  Okay.  And where did you go at that point?

2    What happened next?

3    A.  At that point I maneuvered my vehicle directly

4    behind him.  As he started to come up to this Flint

5    Street intersection, again at this time he was

6    driving pretty eradicate and evasive, and continued

7    to drive pretty fast and come more to an abrupt

8    stop when he got to this intersection at Flint and

9    Exchange Street.  At that point I was probably

10    about one to two car lengths behind him.  Once he

11    made that intersection, it appeared that he wanted

12    to take a right-hand turn, so once he's in the

13    intersection he kind of did a swerving motion and

14    decided to take a last minute turn left to go

15    eastbound on Flint Street, and he then -- he

16    failed --

17    Q.  Can I stop you here.  So he approaches Flint

18    Street, stops, starts to turn right, and then turns

19    left, is that your testimony?

20    A.  Yes.

21    Q.  Okay.  At any point during this maneuver, did

22    he use -- or before this maneuver, did he activate

23    a turn signal?

24    A.  So simultaneously when he began to make that

25    right-hand turn, the vehicle was still in motion

1   more aiming to turn right, he then activated his

2   signal into the intersection, turned left, and then

3   actually made that movement left.

4   Q.  So he was already into the intersection --

5   A.  Correct.

6   Q.  -- is that correct?

7   A.  Correct.

8   Q.  I'm going to ask this question.  Was that more

9   or less than a hundred feet prior to when he turned

10  left?

11  A.  That was less than a hundred feet.

12  Q.  In fact, it was as he turned?

13  A.  Yes.

14  Q.  Okay.  And what did you do when he turned left?

15  A.  Right about that time is when I initiated my

16  emergency lights and activated my sirens to conduct

17  a traffic stop.  I began to travel directly behind

18  him.  He did not stop right away.  He failed to

19  yield to my emergency lights, as he continued to

20  travel eastbound on Flint towards this dead end.

21  Q.  Okay.  And where did he -- did he eventually

22  stop his vehicle?

23  A.  He did eventually.

24  Q.  Where did he eventually stop his vehicle?

25  A.  Right there.

1    Q.   Now you've placed a dot on the screen.  I'm

2    trying to read it into the record.  Actually, you

3    know what I'm going to do, I'm going to have you

4    mark the actual Government Exhibit, because I think

5    it's hard to describe.  So permission for the

6    witness to step down, your Honor?

7              THE COURT:  Sure.

8    BY MS. HARTFORD:

9    Q.   Come on down, Officer.  If you could, please,

10   on Government's Exhibit 1 place an X where he

11   stopped his vehicle -- where the defendant stopped.

12        For the record, the pen is not working very

13   well.

14             THE COURT:  Try this one.

15             MS. HARTFORD:  Okay.  Judge Feldman may

16   have a better one.

17             THE COURT:  It's a felt tip.

18             MS. HARTFORD:  Thank you.  That will be a

19   little clearer than this ballpoint.

20        Thank you, your Honor.

21             THE COURT:  Are you going to use more

22   marks?  You might want to keep it.

23             MS. HARTFORD:  Thank you.  Would you like

24   my pen in the meantime?

25             THE COURT:  No.  I want mine back when

1   he's done.

2           MS. HARTFORD:  Okay.

3   BY MS. HARTFORD:

4   Q.  All right.  Now, Officer Minurka, what happened

5   when -- so is it fair to say that the defendant

6   traveled this length of Flint Street with your

7   lights activated and sirens on and didn't pull

8   over?

9   A.  That's correct.

10  Q.  Okay.  What happened next after he stopped his

11  vehicle?

12  A.  As he stopped the vehicle, I observed the

13  driver's side door open quickly, and he exited in a

14  full sprint, fled from the vehicle.

15  Q.  Okay.  And can you indicate on the map where he

16  fled?

17  A.  Yes.  Can you see it?

18  Q.  Yes.

19  A.  Okay.  So he fled around the side, so I guess

20  it would be considered to be east side of the

21  building.

22  Q.  You say building, are you referring to this

23  small structure on the map?

24  A.  Yes.  It's a vacant shed.  It's not very big.

25  Q.  Okay.

1    A.   He kind of goes around this east side of the

2    shed, and he continues to go southbound direction

3    this way.

4    Q.   Okay.

5    A.   He was very quickly after that -- he didn't

6    travel too much further because the brush --

7    Q.   What do you mean the brush?

8    A.   There was brush on the ground, like bushes.

9    Q.   Okay.

10   A.   And kind of impeded on the way where he would

11   be able to maneuver behind there.

12   Q.   And what did you -- what did you observe during

13   this?  Well, where were you at this time?

14   A.   So at this time -- as soon as he exited the

15   vehicle, my partner Officer Giancursio did pursue

16   him on foot.  At that point I did continue to drive

17   to about this area here prior to exiting my

18   vehicle.

19   Q.   Okay.

20   A.   Just thinking that he might try to come down

21   the path.  And at that point I exited and actually

22   began running in his direction.  I got to about

23   15 yards away from Mr. Tillard.  He was illuminated

24   by the flashlight Officer Giancursio was using.  I

25   kind of had a good view of him.  Unfortunately, I

1  wasn't able to move too fast just because of the

2  brush on the ground.  During that time I saw him

3  reach the front of his body and he like made a

4  throwing motion with his right hand towards the

5  western side.  And shortly after that he was taken

6  into custody by Officer Giancursio.  Sorry,

7  meanwhile when I was trying to do detention, I was

8  yelling get on the ground, on the ground, which I

9  believe was (indiscernible) and Officer Giancursio

10  taken into custody.

11  Q.  Wait.  Could you repeat that?  Who was yelling

12  get on the ground?

13  A.  I was yelling get on the ground.

14  Q.  And what happened?

15  A.  He --I don't know if it was like Officer

16  Giancursio assisting him to the ground or him

17  actually complying and getting to the ground right

18  at that point.

19  Q.  All right.  So you're not sure whether it was

20  compliance or force, but he got to the ground?

21  A.  Right.

22  Q.  Okay.  And did you apprehend him?

23  A.  Officer Giancursio.

24  Q.  Okay.  Thank you.  Did you hear him make any

25  statements?

1    A.   I did.

2    Q.   Can you tell us about that, please?

3    A.   Yes.  When I was finally able to untangle

4    myself from the brush, he was still on the ground.

5    Just part way he was actually being assisted up, he

6    made statement to the effect of I ran because I had

7    weed on me.

8    Q.   I ran because I had weed on me?

9    A.   Something to that effect.

10   Q.   Did you ask him any questions --

11   A.   No, I did not.

12   Q.   -- to get that response?

13   A.   I did not.

14   Q.   Did Officer Giancursio ask him any questions to

15   elicit that response?

16   A.   I did not hear him do that.

17   Q.   So you didn't hear Officer Giancursio ask him

18   anything?

19   A.   No.

20   Q.   Were there any other officers or any other

21   people in the area at the time?

22   A.   Not at the time.

23   Q.   I'd like to ask you a little bit about this

24   area.  Can you describe the neighborhood that you

25   were patrolling in and where this took place?

1    A.  Yes.  Specifically that night we were in the

2    area due to the fact that there had been an

3    increase in violence, considered to be a high-crime

4    area, specifically that gas station at Summer and

5    South Plymouth.  Probably at right now it

6    considerably gets one of the most 911 calls a day

7    for vice activity.  Leading from that time even to

8    present day, actually now has been considered one

9    of our pop areas which we call for a pocket of the

10    city where we try to concentrate on for gun and

11    drug violence.

12    Q.  Was it given that designation prior to or after

13    this arrest?

14    A.  Somewhere around that time.  I really can't

15    recall if it was before or after.

16    Q.  So is it fair to say that this would be a

17    high-crime area?

18    A.  Yes, ma'am.

19    Q.  So did you take Mr. Tillard into custody?

20    A.  Officer Giancursio took him into custody.

21    Q.  Did you conduct a pat-down of his person or

22    somebody else?

23    A.  Officer Giancursio did.  I believe he escorted

24    him.

25    Q.  But you didn't do that?

1    A.   I did not, no.

2    Q.   Okay.  And did you originally locate the gun in

3    this case?

4    A.   Officer Giancursio did.

5    Q.   I don't want to ask you about what he did.  We

6    can address that with him at another time.

7    A.   Okay.

8    Q.   Now, at some point did you attempt to conduct a

9    post-arrest interview of Mr. Tillard?

10   A.   I did.

11   Q.   Do you recall approximately what time that was?

12   A.   I believe it was just before 11:00 p.m.

13   Q.   And do you use an RPD notification and waiver

14   card in order to conduct that interview?

15   A.   I do.  I use notification waiver card 1185.

16   Q.   Showing you Government's Exhibit 4, or a

17   copy -- or Government's Exhibit 4, can you identify

18   what this is, please?

19   A.   Yes.  This is waiver form 1185.

20   Q.   And is this an original or a copy?

21   A.   This appears to be the original.

22   Q.   Sorry.  I'm going to ask you to take a look at

23   the actual exhibit.

24   A.   Oh, I didn't see on there, this is a copy.

25   Q.   Is this the original card that you used or a

1    photocopy?

2    A.    Photocopy.

3    Q.    All right.    Is it a fair and accurate copy of

4    the card that you used?

5    A.    It is.

6    Q.    Have there been any additions or deletions?

7    A.    No.

8    Q.    Okay.    So otherwise it's -- the copy is the

9    same as the original?

10   A.    Correct.    This is my handwriting.

11   Q.    I'll put this back up on the visualizer.    So,

12   I'm going to back you up a little bit.    Where were

13   you when you attempted a post-arrest interview of

14   Mr. Tillard?

15   A.    My patrol vehicle.

16   Q.    And where was Mr. Tillard?

17   A.    He was in the back of my patrol vehicle.

18   Q.    Were you both in the vehicle?

19   A.    Yes.

20   Q.    Where was he seated?

21   A.    He was seated directly behind me.

22   Q.    So he was seated in the back seat and you were

23   in the front seat?

24   A.    Yes.

25   Q.    Okay.    Were there any other officers or other

1    people in the vehicle at that time?

2    A.   Not at that time.

3    Q.   Was the defendant handcuffed at that time?

4    A.   Yes.

5    Q.   Prior to speaking with the defendant, did you

6    ask him about his educational level?

7    A.   I did.

8    Q.   And what did he say?

9    A.   He said he had a GED.

10   Q.   Did you ask him whether he could read and write

11   English?

12   A.   I did.

13   Q.   And what was his answer?

14   A.   He said he could.

15   Q.   Did you ask whether he was under the influence

16   of alcohol, drugs, or other medication?

17   A.   I did.

18   Q.   And what was his answer?

19   A.   He said no.

20   Q.   Now, other than his answer no, did the

21   defendant appear at all to be under the influence

22   of alcohol, drugs, or other medications?

23   A.   He did not.

24   Q.   And is that something that you've been trained

25   to identify in people whether they're under the

1    influence --

2    A.  Yes.

3    Q.  -- as part of your experience and training?

4    A.  Yes.  Furthermore, I did inquire further to

5    make sure, because the comment that he made for

6    marijuana, I asked if he did ingest or take any

7    earlier that day.  He did -- he said, in fact, he

8    did smoke earlier that day, however he did not feel

9    the effects of it at this time.

10   Q.  Now, directing your attention back to

11   Government Exhibit 4 that also has a copy here of

12   this grand jury Exhibit 2.  That is not the exhibit

13   sticker, it's this -- just for the record, it's

14   this 4 on the yellow Government Exhibit of the

15   bottom right of the document.  Whose writing

16   appears on this document?

17   A.  This is my writing.

18   Q.  And does it appear to be in the same or similar

19   condition as when you used it on the date in

20   question?

21   A.  Yes.

22   Q.  Can you tell us exactly how you used this form

23   in order to advise the defendant of his Miranda

24   rights on February 25th of 2017?

25   A.  Yes.  I read 1 through 5 warning questions

1    verbatim as they are on the card.

2    Q.  And did you read them to the defendant as they

3    appear on the form?

4    A.  I did.

5    Q.  Can you please read those rights you advised

6    the defendant of into the record?

7    A.  Yes.  You have the right to remain silent.  You

8    do not have to say anything if you don't want to.

9    Anything you do say can be used against you in a

10    Court of Law.  You might have the right to talk to

11    a lawyer before answering any questions and have

12    him here with you.  If you can't pay for a lawyer,

13    one will be given to you before any questioning if

14    you wish.  If you do wish to talk to me, you can

15    stop at any time.

16    Q.  After you read the defendant the contents of

17    the exhibit, did you ask him whether he understood

18    the rights?

19    A.  Yes.

20    Q.  What did he say?

21    A.  For waiver one he said yes.  And for waiver two

22    he said yeah.

23    Q.  Waiver one, do you understand what I just said

24    to you, you wrote in quotation marks yes?

25    A.  Yes.

1    Q.   And waiver two, with these rights in mind do

2    you agree to talk with me now, and you wrote in

3    quotes yeah.   What do the quotation marks indicate?

4    A.   Exactly what his response was.

5    Q.   So that's verbatim?

6    A.   Yes.

7    Q.   Did he ask you to repeat any of the rights that

8    you read to him?

9    A.   He did not.

10   Q.   Did he appear confused to you regarding the

11   rights that you read him?

12   A.   No.

13   Q.   After the defendant indicated that he

14   understood his rights, did you ask him whether he

15   would agree to give up those rights and speak with

16   you -- I'm sorry, we already addressed that.

17   That's a waiver question two, correct?

18   A.   Correct.

19   Q.   And he said yeah.   And you recorded those

20   responses both on the card?

21   A.   Yes, ma'am.

22   Q.   Did you record those at that time?

23   A.   Yes.

24   Q.   Now prior to asking the questions or

25   interviewing the defendant, did you make any

1    promises about potential sentencing with the

2    defendant if he spoke to you?

3    A.   No.

4    Q.   Did you make any statements about speaking with

5    the prosecutors about his charges in exchange for

6    his statement?

7    A.   No.

8    Q.   Did you talk about potential cooperation at

9    that time?

10   A.   No.

11   Q.   Did you threaten him in any way during the

12   course of this interview?

13   A.   No.

14   Q.   Did you make any physical contact with him

15   during the course of the interview?

16   A.   No.

17   Q.   Did he ever ask during the interview to stop

18   speaking with you or indicate he no longer wanted

19   to talk to you?

20   A.   No.

21   Q.   Did he ever indicate that he wanted to speak

22   with a lawyer or ask any questions about a lawyer?

23   A.   No.

24   Q.   Now, about how long did the total interview

25   with the defendant last if you can recall?

1    A.   I believe from the start of Miranda to after

2    the written statement, about 45 minutes or so.

3    Q.   Is that an estimate?

4    A.   Yes.

5    Q.   Can you tell us in general terms how it was

6    that you conducted the interview of the defendant?

7    A.   Yes, I can.

8    Q.   Please do.

9    A.   So it was my decision to interview him in the

10   vehicle, which is sometimes not the standard.

11   Typically we would go to the (indiscernible), but

12   he was very eager to speak with me.  Maybe prior to

13   our rapport.  I felt very comfortable talking to

14   him.  I believe that he did too at the time.  He

15   seemed like he wanted to talk about it immediately.

16   So before that I made that decision to talk to him

17   in the car and do the Miranda card.  We got right

18   into the interview without little chatter of, you

19   know, unrelated events.  He told me that he saw a

20   gentleman in a black SUV that he had recognized

21   that robbed and shot him prior months.  He was

22   parked in that 700 South Plymouth gas station.

23   When he saw him, he turned around the corner on

24   Doran and Edith and parked his vehicle, exited the

25   vehicle with a handgun, walked towards that SUV

1    with the intent to threaten or flash the gun -- I

2    think he used flash.  In the interview he initially

3    said he said he cocked the gun, I believe his

4    verbiage was, indicating he racked the slide to see

5    if there was a round had chambered in the firearm,

6    which there wasn't.  Once he realized that there

7    was no magazine and no bullets, he decided to turn

8    back around towards his vehicle, at which point I

9    think he indicated that he saw our police car.

10   He got in his vehicle and began to drive away.

11   Subsequently he made that turn down Flint Street,

12   knowing that we were going to stop him.  He fled on

13   foot, and I think he used the word pitched as far

14   as meaning throwing the gun.  Subsequently after --

15   after all that, we did further go into detail on

16   where he had initially gotten the gun, whether he

17   knew it was loaded, and vice versa.  And he said

18   that he did.  He bought the gun on Bartlett Street

19   for $250 I believe from a male he knows as Heem.

20   He provided a Facebook name of Heem Shoota.

21   During that conversation some of it took a

22   little bit of time just because I had to clarify

23   certain words that he used, certain verbiage that I

24   never had heard of or don't use, such as when he

25   said cocking --

1    Q.   Did you ask him follow up questions?

2    A.   I did.   Just so I could comprehend what he was

3    kind of saying.   And when he said pitch I kind of

4    wanted to see what he meant by that.

5         You know, after that, I asked him if he wanted

6    to provide a written statement, and he said he did

7    want to, and that's when I returned to -- I stepped

8    out of the vehicle for a second to grab it from my

9    trunk, the actual paper of the written statement.

10   I was back in the driver's seat within seconds.   We

11   began -- I believe I noted on top of that written

12   statement form when we began the actual written

13   statement.

14   Q.   And is Government Exhibit 5 --

15   A.   Yes.

16   Q.   Do you recognize this?

17   A.   I do.

18   Q.   And what is that?

19   A.   That is the written statement form.

20   Q.   Is that the same one that you're talking about?

21   A.   Yes.

22   Q.   Okay.   Go ahead.

23   A.   So around 11:24 p.m. is when we started the

24   written statement.   During this time we went

25   through the -- as chronological as possible went

1    through the events that happened throughout the

2    day.  There were certain things that he did not

3    want inside that written statement, and I explained

4    to him that it was voluntary, and he could put

5    whatever he wanted as long as it's the truth.  And

6    he said okay.

7    Q.  So, is it fair to say that he said things in

8    the statement to you in the car, this first

9    conversation that you had --

10   A.  Yes.

11   Q.  -- that are then not contained in this written

12   statement?

13   A.  Correct.

14   Q.  And why is that?

15   A.  I don't want to testify on what maybe he led

16   him not to want to put something in there.

17   Q.  Let me ask a better question to clarify a

18   little bit more.  Why is it that you allowed him to

19   make that decision what goes in the written

20   statement of what he just told you and not just put

21   it all in there?

22   A.  Because it's his facts and his truth.  So it

23   has nothing to do with my story.  That's --

24   Q.  Is it accurate to say that he was only willing

25   to put certain things in writing and the other he

1    only gave to you if it wasn't in writing?

2    A.   Correct.

3    Q.   Okay.  So what's contained in this written

4    statement the defendant decided what would go in

5    here, correct?

6    A.   Yes.

7    Q.   This top part here I see there's a time start,

8    time finished.  Did you fill that out at the time?

9    A.   I did.  Obviously the time of finish is when I

10   finished the conclusion of the written statement.

11   Q.   Okay.  And I, Robert Tillard, 32 years, this

12   part at the top, did you fill that part out?

13   A.   I did.

14   Q.   And this RT, I see all these rights.  I have

15   the right to remain silent.  I do not have to say

16   anything if I don't want to.  Anything that I do

17   say can be used against me in a Court of Law.  I

18   have the right to talk to a lawyer before I answer

19   any questions, and to have them here with me during

20   any questioning if I wish.  But if I agree to talk

21   about this matter without a lawyer present, I can

22   stop talking at any time.  Did you review those

23   with Mr. Tillard?

24   A.   I did.

25   Q.   How did you review those with him?

1    A.   So after it was reduced into writing, there

2    came a time where he was unhandcuffed in order to

3    view -- review the statement and essentially sign

4    it.   But prior to that, I gave him the opportunity,

5    something I like to do, not everybody does it, I

6    gave him the opportunity again to read prior to

7    making that signature, he still understood his

8    rights.  And once he indicated that he did read it,

9    I just told him to put his initials on top of it,

10   that's so you can see the RT over that.  Yes.

11   Q.   The RT that is on top superimposed I suppose

12   but written directly on those rights, correct?

13   A.   Right, to make a mark just to show that you

14   read it and you understand.  So he did so.  And

15   then I also had him initial the front, the back,

16   make any -- yep.  The front.

17          THE COURT:  Whose handwriting is the

18   statement?

19          THE WITNESS:  The handwriting is my

20   handwriting, sir.

21          THE COURT:  Why don't you let him write it

22   out?

23          THE WITNESS:  I've never -- any time we've

24   ever did a written statement, just the way the

25   procedure's been, I was always taught to handwrite

1    the written statement and reduce in your own

2    writing.

3    BY MS. HARTFORD:

4    Q.  Now, there's writing on this form that is not

5    yours, correct?

6    A.  Yes.

7    Q.  What writing is that?

8    A.  Those would be his initials, his signature.

9    Q.  Okay.  And can you point out to the Court the

10   places where his initials appear?

11   A.  Yes.  So in the beginning of the narrative --

12   Q.  You can touch the screen.

13   A.  So the beginning of the narrative, if I cross

14   out anything like a spelling error, I usually have

15   him initial that, which I don't think I did on this

16   case.  So I have him initial here, and then again

17   just the end of the narrative so nothing can be put

18   in there, reviewed or added later.  I had him sign

19   or initial at the bottom as well.

20   Q.  And the signature next to this X on the

21   signature line, who signed that?

22   A.  Robert Tillard.

23   Q.  And you mentioned that you have him initial the

24   back -- or what happened on the back?

25   A.  I put that mark on the back to indicate that

1    it's the original copy.

2    Q.  So opposed to having writing on the back of the

3    original, this was to indicate there was no writing

4    on the back of the original?

5    A.  Yes, that and just for administrative task to

6    know which one is original and which one is a copy.

7    Q.  Okay.

8    A.  So once this is reduced to writing, I give him

9    the opportunity to -- at first I have him read the

10   first few lines out loud so I can understand that

11   he read and understand the language and can read

12   English.  He did so.  And then I had him read the

13   rest of the statement to make sure that he didn't

14   want to make any changes.  He indicated that he did

15   not want to make any changes, and then I asked him

16   if he wanted to sign this written statement and

17   this is the truth, and he said yes.  And he signed

18   it.

19   Q.  Can you please read into the record what that

20   written statement is --

21   A.  I can.

22   Q.  -- that Robert Tillard adopted as his own by

23   initialing and signing it on that day?

24   A.  Yes.

25          THE COURT:  Not that I'm trying to

1    interrupt, but do I really care what the substance

2    of the statement is?

3          MS. HARTFORD:  I guess not, Judge.  We'll

4    skip forward and save a little bit of time, how's

5    that?

6    BY MS. HARTFORD:

7    Q.  Can you describe the defendant's attitude and

8    demeanor throughout this interview?

9    A.  Yes.  You know, he was very eager to talk to me

10   again.  Me and him have always been respectful to

11   each other, so it was kind of, you know -- it was

12   just a little different than any other cases I've

13   done just because we had essentially a relationship

14   before, and it was completely voluntary.  He kind

15   of told me what happened and I put down exactly

16   that, you know.

17   Q.  I'm going to come back to you about your prior

18   interactions with the defendant in a little bit.  I

19   want to ask you some more questions specifically

20   about the interview.  But that perhaps will help

21   educate his attitude and demeanor during the

22   interview.

23        Did you ask him any specific questions

24   regarding the contraband located during this --

25   this day, the marijuana and the gun?

1    A.   I did ask him a question about the gun.

2    Q.   About the gun?

3    A.   Yes.

4    Q.   And did he admit that it belonged to him?

5    A.   He did.

6    Q.   Okay.  Now, when he signed the interview, where

7    did that take place?

8    A.   He signed the written statement on the back of

9    my car.  I was also present with Officer Barton,

10   who is now a sergeant during this time.  He was

11   able to -- I was able to unhandcuff him, so I

12   needed another cover officer there to help me in

13   case he tried to flee or run away or something.

14   Q.   Okay.

15   A.   But just standard protocol, I just wanted

16   another officer with me.

17   Q.   Okay.

18   A.   At that time he was unhandcuffed.  I used my

19   flashlight to illuminate just to make sure he could

20   have a clear view of the written statement.  I

21   think he was also using prescription glasses at the

22   time which he had on, and that's where he signed

23   it.

24   Q.   Okay.  Now, I would like to turn your attention

25   to your use or lack thereof of body worn camera in

1  this incident --

2  A.  Yes.

3  Q.  -- okay.  You received a counseling memorandum

4  regarding this incident, correct?

5  A.  Yes.

6  Q.  Specifically that you were in violation of

7  RPD's body worn camera policy?

8  A.  I was.

9  Q.  Was that counseling memorandum specifically in

10  relation to this day or in relation to other

11  interactions with Mr. Tillard?

12  A.  This day.

13  Q.  Okay.  And were you wearing a body worn camera

14  on February 25th of 2017, during this interaction?

15  A.  Yes.  I was assigned a body worn camera.  I

16  can't remember if it was actually on me or not.

17  But, yes.

18  Q.  So you were assigned one, but you don't know if

19  you were wearing it?

20  A.  Yes.  It could have been in the -- in my car on

21  the docking station in my car or on the visor.  I

22  can't remember if it was on my uniform or not.

23  Q.  Okay.  Did you turn it on at all during this

24  encounter?

25  A.  I did not.

1  Q.  And how long had you had that body worn camera

2  issued to you prior to this encounter?

3  A.  Thirty days or less.

4  Q.  Now, why didn't you turn it on during this

5  encounter?  I think you've already mentioned you

6  don't know where it was.

7  A.  Right.  To be honest, I just wasn't used to it.

8  I know it's not a good excuse.  Just made a

9  mistake.  And we went almost four years, you know,

10  driving -- being a police officer on a day-to-day

11  basis without body cams.  This was one of the first

12  events that I've ever had essentially like a foot

13  chase involved where I would have to think fast to

14  turn my body cam on, and activate it, and put it on

15  my uniform.  And just didn't, didn't even -- didn't

16  even think about doing it, unfortunately.  In

17  hindsight I wish I did.

18          THE COURT:  Did your partner have it on?

19          THE WITNESS:  I believe his circumstances

20  were the same as mine.  So we work in the same

21  section, so we were all issued them at the same

22  time.  There was for this instance, it wasn't

23  disciplinary.  It was a training counseling

24  memorandum that basically just said that you

25  require more training, which is true, because if I

1    didn't I would have had it activated.  So since

2    then -- like I've learned from my mistakes, and

3    since then I've never had any issues with

4    activating my body cam, nor have I had any

5    complaints.  In fact, the department will do random

6    audits on our body cams, and since then I've been

7    in a hundred percent compliance.

8    BY MS. HARTFORD:

9    Q.  I'd like to ask you a little bit about your

10   interactions -- the history of your interactions

11   with the defendant.

12   A.  Okay.

13   Q.  So safe to say that February 5th, 2017, was not

14   your first interaction with Mr. Tillard?

15   A.  That is correct.

16   Q.  When's the first time that you recall coming

17   into contact with the defendant?

18   A.  It was in August, I believe, 2016.  I responded

19   to a shots fired activation in the area of Bartlett

20   and Reynolds Street, which is very close and nearby

21   where this incident occurred.  He ended up -- I

22   ended up locating him with a gunshot wound to his

23   foot.  So he was a victim of a gunshot wound.

24   Q.  Okay.  Were you the lead officer on that, do

25   you recall?

1  A.  I believe I was the first responding officer,

2  but the area in which it happened occurred under

3  another officer's beat, so he took the primary

4  report I believe.

5  Q.  Okay.  So what happened as a result of that

6  interaction when he was shot in the foot?

7  A.  During that interaction, you know, he was

8  ultimately uncooperative as far as who the suspects

9  were.  And as they were talking to him, we did

10  make, you know, some type of rapport prior to him

11  getting out of the ambulance.  And I asked him, you

12  know, listen, if there's anything that we can know

13  or do to help you out in the past, and next in

14  trying to locate these guys that shot you, then I

15  will help you.  So that kind of went and segued

16  into the next time we saw each other, I asked him

17  if he had further knowledge of what happened, and

18  he did.  He was more forthcoming.  He did identify

19  a couple people, not by name, but mostly where they

20  hung out and their locations and descriptions of

21  them.  And I continued to do follow-ups with them

22  throughout my day-to-day course of police business.

23  And I did identify a certain individual that I

24  believe was involved in this whole thing that

25  happened.  And mostly our relationship was built on

1   the fact that he was a victim of something and I

2   wanted to help him.

3   Q.  You said, you know, you'd follow up with him,

4   you'd see him?  How is it that you would follow up

5   with him?

6   A.  Well, he lives on Bartlett Street, which is one

7   of the main like corridor streets that we travel

8   down.

9   Q.  Is that in your beat?

10  A.  That is directly in my beat.

11  Q.  Okay.  So it's someplace you travel frequently?

12  A.  Multiple times throughout the shift.

13  Q.  Okay.  Go ahead.

14  A.  During that time he lives actually right there

15  on 23 Bartlett Street, and I would see him outside

16  of his car or sitting in his car in front of the

17  driveway almost everyday.  Sometimes, you know,

18  some of our interactions wasn't criminal nature at

19  all.  Mostly, hey, how are you doing, and keep

20  driving by.  Just community.  But there was certain

21  times where he was subject of a traffic stop, which

22  I was involved in.

23  Q.  Do you recall how many times there were traffic

24  stops that you were involved in with this

25  defendant?

1    A.   I don't know the exact amount of times, but it

2    was a handful of times.

3    Q.   More than once?

4    A.   Oh, yeah.

5    Q.   Okay.  I just thought of something that I don't

6    think I asked you, so I'm sorry I'm jumping around

7    a little bit.  I asked if originally when you saw

8    the defendant driving a car if you could see if

9    there was anyone in the passenger seat.

10   A.   Okay.

11   Q.   Did you, when he stopped the car and ran from

12   the car, did you learn whether there was anybody in

13   the passenger seat?

14   A.   I did.

15   Q.   And who was that?

16   A.   So I actually went back to the car to secure it

17   because it was by itself obviously.  That's when I

18   identified there was a passenger in the seat which

19   took me by surprise.  End up being Sherry Kitchens,

20   who I learned to be the baby mother of Robert

21   Tillard.

22   Q.   Now, did you issue any traffic tickets in this

23   case?

24   A.   I personally did not write tickets.

25   Q.   Were you aware of anybody else did?

1  A.  I did.

2  Q.  I don't want you to get too into it, because,

3  again, we'll have that officer testify personally

4  to what he did.  But do you know who issued those

5  tickets?

6  A.  Yes.

7  Q.  And who was that?

8  A.  Officer Giancursio.

9  Q.  Okay.  Are you personally aware of whether

10 Miss Kitchens has a driver's license or not?

11 A.  I'm personally not aware.  I do vaguely

12 remember learning that night -- I can't remember

13 who ran her license, but I believe it was expired.

14 Q.  Okay.  But you're not sure, because you didn't

15 do it?

16 A.  I didn't do it.

17 Q.  Okay.  I want to avoid things that you don't

18 have personal knowledge of.

19 A.  Okay.

20 Q.  But I did want to cover that point.

21 A.  Yes.  Okay.

22 Q.  So back to prior infractions, you had prior

23 traffic stops of the defendant, correct?

24 A.  Correct.

25 Q.  And approximately -- you said a handful of

1  traffic stops with the defendant?

2  A.  Yes.

3  Q.  Okay.  Did you issue any tickets on those prior

4  incidents?

5  A.  I don't think any tickets were issued on those.

6  Q.  Okay.  Why not?

7  A.  At least I didn't write any tickets on those.

8  Q.  Okay.

9  A.  So to clarify, I wasn't always the first one to

10  stop him or -- another officer could stop him and I

11  would assist.  They may have written tickets.  Just

12  by discretion.  Essentially, just by discretion and

13  no -- and like I said, I was -- my intent was to

14  help him out, you know, to really figure out what

15  was going on, who was potentially robbing and

16  shooting at him.  Because apparently I learned that

17  it wasn't the first time that he was robbed by

18  these same individuals.  And I didn't want it to be

19  a punitive thing where you're writing a ticket

20  every single time you stop him either.  But at the

21  same time, if it's a violation and I can help by

22  using our discretion, I did so.

23  Q.  Had you -- I'm trying to think.  Had you

24  stopped him with marijuana --

25  A.  Yes --

1    Q.  -- during some of those interactions?

2    A.  -- I have.

3    Q.  And did you arrest him for marijuana on any of

4    those incidents?

5    A.  I did not.

6    Q.  Why not?

7    A.  Well, at the -- legally, obviously being able

8    to seize marijuana is my discretion whether I would

9    turn it in for evidence or safekeeping and

10    destruction.  And, you know, the marijuana that we

11    found was nothing of high quantity, so, again, it

12    was discretionary and my decision to take it, you

13    know, turn it in for destruction.

14    Q.  Is that something that you do with regard to

15    other individuals too?

16    A.  All the time.

17    Q.  All the time.  So this isn't unique to

18    Mr. Tillard?

19    A.  No.

20    Q.  Is this something that came up during the

21    course of the PSS investigation?

22    A.  I believe it did.

23    Q.  And you testified -- or you told them

24    similarly?

25    A.  Correct.

1    Q.   Okay.  You said it wasn't high quantity of

2    marijuana.  Was it indicative of individual use or

3    distribution as far as the quantity goes?

4    A.   Based on my training and experience I would

5    certainly say distribution.

6    Q.   Okay.  So even though it wasn't high quantity,

7    it still was more than you would attribute to

8    personal use?

9    A.   Correct.

10   Q.   Okay.  Did you ever contact Mr. Tillard via

11   telephone or text message?

12   A.   I did, yes.

13   Q.   Okay.  Approximately how many times did you

14   contact him by a text message?

15   A.   It wasn't many times.  I can't remember exactly

16   how many.

17   Q.   Okay.  Do you recall whether he gave you his

18   cellphone number?

19   A.   Yes, he did.

20   Q.   Okay.  Did he respond to you when you texted

21   him, if you recall?

22   A.   I honestly don't recall.

23   Q.   Okay.  Did you use your personal phone or an

24   RPD phone to conduct those text messages?

25   A.   I used my personal phone.

1  Q.  And why didn't you use an RPD phone to do that?

2  A.  I just -- I should have, but I just used my

3  phone.  I know some guys have different phones

4  separate from work.  But I've always my personal

5  phone.

6  Q.  Is that how you handle other potential

7  cooperators?

8  A.  I do.

9  Q.  So it wasn't unique to Mr. Tillard?

10  A.  No.

11  Q.  As far as his potential as a cooperator, was

12  that something he indicated he wanted to do?

13  A.  Yes.

14  Q.  Can you tell us a little bit about that?

15  A.  Yes.  So during this time I was kind of in the

16  infancy stages of learning how you could actually

17  use a confidential informant through like our

18  special investigation section, use them actually as

19  a paid informant.  At this point it was more so

20  just him helping me try to help himself as far as

21  finding somebody on the street.  There was more to

22  talk about him doing further, but that was never

23  anything that I really had the ability to do on a

24  patrol level.  So it didn't really go too far.  But

25  that was discussed.

1    Q.  Okay.  So that was something that Mr. Tillard

2    was interested in but it never got to that point,

3    is that correct?

4    A.  Correct.

5    Q.  Just a little bit of housekeeping here.  I

6    didn't end up using these as demonstrative aids

7    because I think that the map did the job.  But I

8    want these to be clear on the record what they are.

9    Government Exhibit 1A, what is this view?

10   A.  Essentially this is an overall view of the

11   Flint Street where it goes into that dead end and

12   off of Exchange Street.

13   Q.  So is this at the corner of Flint and Exchange?

14   A.  Yes.

15   Q.  Are you able to see on this map approximately

16   where it was that the defendant finally pulled his

17   car over?

18   A.  You cannot see it on this map.

19   Q.  Okay.  I'm going to show you Government

20   Exhibit 1B.  What are we looking at here?

21   A.  Okay.  Essentially it's the same photograph

22   looking down the same direction on Flint Street.

23   Q.  Is it a little bit farther down Flint Street?

24   A.  A little bit further down Flint Street, yes.

25   Q.  Are you able to see where he stopped his car on

1    this photograph?

2    A.   You can partially see some of the stony loose

3    gravel to the right of the road.

4    Q.   Okay.  Are you -- can you circle that on the

5    screen, please?

6    A.   Yes.

7    Q.   You placed a red dot.  It looks like it's kind

8    of across the street from that second building on

9    the left, the darker reddish brick one, is that

10   correct?

11   A.   That is correct.

12   Q.   Government Exhibit 2, what are we looking at

13   here?

14   A.   That is the firearm that was located in the

15   field where he was taken into custody.

16   Q.   Now, again, are you the one who located that

17   firearm?

18   A.   Officer Giancursio.

19   Q.   But did you see it after he located it?

20   A.   I did.

21   Q.   And is that how it appeared at that time on

22   that day?

23   A.   Yes.

24   Q.   Did you see anybody touch it or move it prior

25   to seeing it?

1    A.  I did not.

2    Q.  Did you take this photograph?

3    A.  I did not.

4    Q.  Government Exhibit 3, what are we looking at

5    here?

6    A.  Essentially it's another overall photograph of

7    the firearm in the snow.

8    Q.  You mentioned it's in the snow.  Is there any

9    snow on top of that firearm?

10   A.  No, there's not.

11   Q.  Okay.  Is there a magazine in that firearm?

12   A.  There is not.

13   Q.  Okay.

14          MS. HARTFORD:  I believe those are all my

15   questions, your Honor.

16          THE COURT:  Okay.  When you said you and

17   your partner Officer Giancursio --

18          THE WITNESS:  Yes, sir.

19          THE COURT:  -- were issued the body

20   cameras around the same time?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Had you worn yours previously

23   to that?

24          THE WITNESS:  I have.  We are supposed to.

25   Once they were issued, yes.

1          THE COURT:  It was just this particular

2     day you didn't put it on?

3          THE WITNESS:  Just to be honest, it was

4     honestly towards the end of the night, and maybe we

5     both were just -- I really don't know what his

6     excuse was.  Just honestly it was just a mistake.

7     I think I can definitely tell you that this was the

8     first incident that I can remember having a body

9     worn camera that resulted in more like a stressful

10    environment, you know, foot chase and thinking

11    quickly.  This was definitely my first time having

12    to adapt to that.

13         THE COURT:  I'm just trying to -- of the

14    30 days that you worked or approximately worked

15    before the date of this incident, how many days

16    would you have worn the body wire camera?

17         THE WITNESS:  I was on a four-two wheel at

18    that time.  It could have been probably maybe 10,

19    11 shifts.

20         THE COURT:  Okay.  And you'd wear it each

21    time.  This was unusual for you not to put it on?

22         THE WITNESS:  Correct.

23         THE COURT:  Okay.  And how about your

24    partner, was he kind of wearing it all the time

25    too?

1           THE WITNESS:  It would be probably be

2    around the same exact scenario.

3           THE COURT:  Okay.

4           THE WITNESS:  Like I said, not to -- sorry

5    if it's confusing.

6           THE COURT:  Sure.

7           THE WITNESS:  I very well could have had

8    it on my body.

9           THE COURT:  Just didn't turn it on?

10          THE WITNESS:  Just didn't activate it.

11          THE COURT:  What's the rule as to when

12   you're supposed to turn it on, when you get out of

13   the car?

14          THE WITNESS:  The rule -- that's a good

15   question, because right at that point nobody really

16   knew clearly the answer to that.  And at the time I

17   believe it was just when you're having contact with

18   a prisoner, and it's only got to be outside.  It

19   cannot be any police buildings.  There's certain

20   criteria.  So to avoid that, afterwards, at any

21   point in time I would just turn it on if I got out

22   of the car.

23          THE COURT:  Okay.  So generally if you got

24   out of the car you turned it on.  Would it be on

25   normally when you were in the back of the car

1    interviewing somebody?

2              THE WITNESS:  That's a very good question

3    too.

4              THE COURT:  I only ask really good

5    questions.

6              THE WITNESS:  Thank you for clarifying

7    this.  So to answer your question, I actually --

8    had I gone to the public safety building to

9    interview him, I would be unable to use my body

10   worn camera.  It would be a violation of the RPD

11   policy --

12             THE COURT:  Okay.

13             THE WITNESS:  -- to use body worn camera

14   to interview him with it inside the Post 8

15   building.  Also, in addition to that, there was no

16   policy yet, especially that I was aware of, where

17   you could do a custodial interview with your body

18   worn camera at that point, because they were so

19   new.  There now is a system in place and a form we

20   can do now at this point two years later, however

21   at that time there was not.  And I know based on

22   our policy before that we're not required by our

23   department to interview somebody for a gun arrest.

24   It has to be something higher such as an A1 felony.

25             THE COURT:  Okay.

1            THE WITNESS:  So in that circumstance I

2    wanted to avoid getting in trouble in that regard,

3    because turning it on I thought maybe I would be

4    violating the policy in that regard.

5            THE COURT:  So you ordinarily would not

6    turn your body worn camera on interviewing somebody

7    in the back --

8            THE WITNESS:  No.  That would be very --

9            THE COURT:  It would be similar to

10   interviewing him in a police department building?

11           THE WITNESS:  Correct.

12           THE COURT:  And you thought those rules

13   would apply.

14           THE WITNESS:  Correct.  And free to do

15   that, I would need supervisor permission, and it

16   would be very unordinary.

17           THE COURT:  Okay.  Thank you.  I don't

18   have anything further.

19           MS. HARTFORD:  Okay.  Thank you.

20           THE COURT:  Okay.  We are going to excuse

21   you now.  We're going to hold up cross-examination.

22   I can't tell you when it's going to be, but it's

23   not going to interfere with your service.

24           THE WITNESS:  Okay.

25           THE COURT:  So I think the chances are

1    pretty good it's not going to be until you get back

2    from -- in May.

3                THE WITNESS:  Okay.

4                THE COURT:  I'm sure the government will

5    order the transcript so you'll be able to see what

6    you testified in direct examination, because I know

7    that's a long time from now.

8                THE WITNESS:  Okay.

9                THE COURT:  So I don't think you'll be

10   prejudiced in any way.  Good luck with your

11   service.  Thank you.

12               THE WITNESS:  Thank you, appreciate it.

13               THE COURT:  Where are you headed?

14               THE WITNESS:  Fort Benning, Georgia.

15               THE COURT:  Okay.  Thank you.

16               THE WITNESS:  Thank you.

17               MS. HARTFORD:  Your Honor, if I may, just

18   one point regarding scheduling.

19               THE COURT:  Sure.

20               MS. HARTFORD:  I don't know -- my due date

21   is March 26th, and I anticipate taking some time or

22   off for maternity leave after that.  I believe I'll

23   be back by July.  I haven't gotten permission from

24   my office yet.  I don't know what those dates will

25   be.  I wanted to make the Court aware of that.  I

1    don't know -- I guess once we have a date, we'll

2    figure it out. I don't know if another attorney

3    can substitute in in a middle of a hearing or what

4    not. We'll address that. I just wanted the Court

5    and defense to be aware of my --

6            THE COURT: My experience has been where

7    the defendant's out of custody, you're not

8    necessarily interested in scheduling something just

9    to schedule it. That you would be satisfied if it

10   was later.

11           MS. ZOGHLIN: Yes, that would generally be

12   true, yes.

13           THE COURT: Okay. So I'm not going to

14   worry about it unless the defense worries about it.

15   We have some work to do -- or you have some work to

16   do along with defense counsel in making sure you

17   have everything and then deciding what you want to

18   share, if anything, and what you don't want to

19   share. If that can be done, you know, before

20   Officer Minurka leaves, I'm happy to schedule

21   something that first week of January. But if it

22   can't be done, I think we'll just have to wait and

23   see after he gets back what everybody's doing,

24   okay?

25           MS. HARTFORD: Okay.

1          MS. ZOGHLIN:  Okay.  Thank you.

2          THE COURT:  Thank you.

3          MS. HARTFORD:  Would you like me to hold

4     onto the exhibits?

5          THE COURT:  Yeah.  Until we close the

6     hearing, yeah.  Thank you.

7                *      *      *      *      *      *

1                    CERTIFICATION

2

3       I certify that the foregoing is a

4   correct transcription, to the best of my

5   ability, from the electronic sound recording

6   of the proceedings in this matter.

7

8

9                 s/Michelle L. McLaughlin
                    Michelle L. McLaughlin, RPR
10                   Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25