**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,
                       Plaintiff,

v.

ROBERT E. TILLARD,
                       Defendant.

**REPORT AND RECOMMENDATION**
18-cr-6091-FPG-JWF

### Preliminary Statement

Robert E. Tillard ("the defendant" or "Tillard") is charged by three-count indictment under 21 U.S.C. § 841(a)(1) and (b)(1)(D) with possession of marijuana with intent to distribute; under 18 U.S.C. § 924(c)(1)(A)(i) with being in possession of a firearm in furtherance of a drug trafficking crime; and under 21 U.S.C. §§ 922(g)(1) and 924(a)(2) with being a felon in possession of a firearm. Docket # 35.

Presently before the Court are the defendant's pretrial omnibus motions.[1] The defendant seeks suppression of evidence and statements obtained at the scene of an attempted traffic stop, search, and arrest. Def.'s Mot. to Suppress (Docket # 42). Tillard filed a complaint against Rochester Police Department ("RPD") Officer Peter Minurka ("Officer Minurka") with the Professional Standards Section ("PSS") of the RPD on December 21, 2017 alleging a "pattern of harassment starting approximately six months [before] and culminating in and including the arrest in

---

[1] By Order of Hon. Frank P. Geraci, United States Chief District Judge, dated October 17, 2018, all pretrial matters in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). See Docket # 36.

1

this case." December 12, 2018 Hr'g Tr., Docket # 53 ("Tr. 1"), at 6, 16. The Court reviewed documents related to the PSS complaint <u>in camera</u> to determine if they constituted disclosable <u>Brady</u> material. Oral argument was held on the disclosure of the PSS files on January 25, 2019 and the Court ruled from the bench on each document. <u>See</u> Docket # 55.

An evidentiary hearing on the defendant's motion to suppress was held on December 12, 2018 and continued on August 6, 2019. <u>See</u> Docket ## 44, 63. The defense filed its post-hearing letter on August 28, 2019 (Docket # 65) and the government filed its post-hearing letter on September 11, 2019 (Docket # 67).

The following is my Report and Recommendation as to the defendant's motion to suppress physical evidence seized and statements made during an attempted traffic stop, search, and arrest of the defendant on February 25, 2017.

## Findings of Fact

On February 25, 2017, Officer Minurka was assigned to patrol the Genesee Section of Rochester, which he described as a "high-crime area," between 3:00 p.m. and 11:00 p.m. Tr. 1, at 41, 54. Officer Minurka was driving his marked patrol vehicle, working as a "two-badge unit" with Officer Sam Giancursio ("Officer Giancursio"), who was in the passenger seat. Tr. 1, at 42.

At approximately 10:41 p.m. Officer Minurka observed a tan Toyota Camry (the "Toyota Camry") near the intersection of Edith and South Plymouth Streets. Tr. 1, at 42-43. The Toyota Camry

2

was parked on the south curb facing eastbound on Doran Street. Tr. 1, at 43. Officer Minurka testified that he then saw "a male black exit[] the driver's side of that Toyota Camry. He was wearing a black leather jacket, and appeared that he was holding something in his hand as he was walking towards the store at 700 South Plymouth." Tr. 1, at 43. Officer Minurka further observed that "before [the individual] made it all the way across the street, he . . . turned around and walked right back to that Toyota Camry and entered the driver's seat." Tr. 1, at 44. As he drove in the opposite direction past the Toyota Camry, Officer Minurka saw the vehicle "pull[] away from the curb at a pretty high rate of speed." Tr. 1, at 44.

Officer Minurka immediately identified the driver of the vehicle as Tillard. He knew Tillard well from "previous encounters." Tr. 1, at 45. Officer Minurka knew that Tillard did not have a valid New York State driver's license based on a traffic stop involving Tillard the day before. Tr. 1, at 45. Officer Minurka followed the Toyota Camry and "lost sight of [the Toyota Camry] for a slight time" but then quickly reacquired it. Tr. 1, at 46.

When Officer Minurka caught up to the Toyota Camry, both he and Officer Giancursio testified that they observed Tillard driving erratically and evasively. Tr. 1, at 47; Aug. 6, 2019 Hr'g Tr., Docket # 64 ("Tr. 2"), at 60. Tillard entered the intersection at Flint and Exchange Streets appearing to begin a

3

right turn and "kind of did a swerving motion and decided to take a last minute turn left." Tr. 1, at 47. According to Officers Minurka and Giancursio, Tillard did not activate his turn signal until he was already in the intersection, which was less than 100 feet before the turn. Tr. 1, at 48; Tr. 2, at 59.

Officer Minurka initiated a traffic stop by activating his emergency lights and siren. Tr. 1, at 48. Tillard did not pull over and instead continued eastbound on Flint Street toward a dead end where he stopped his car. Tr. 1, at 48. Officer Minurka saw "the driver's side door open quickly, and [Tillard] exited in a full sprint, fled from the vehicle." Tr. 1, at 50; Tr. 2, at 60. Officers Minurka and Giancursio pursued Tillard on foot toward a wooded area. Tr. 1, at 51; Tr. 2, at 17. When Officer Minurka was about 15 yards from the defendant, he "saw him reach the front of his body and he like made a throwing motion with his right hand." Tr. 1, at 51-52. Officer Giancursio also saw Tillard "take his right hand, pull it up towards the left side of his body and then shoot it straight out to the right." Tr. 2, at 61. Officer Giancursio heard a "thud." Tr. 2, at 61. Officers Minurka and Giancursio both said it was too dark to see at the time what was in Tillard's hand. Tr. 2, at 19-20, 77.

Officer Minurka yelled for Tillard to get on the ground and Officer Giancursio told Tillard to show him his hands. Tr. 1, at 52; Tr. 2, at 60-61. Tillard ended up on the ground, either due to his own compliance or from Officer Giancursio's force. Tr. 1,

4

at 52. While Tillard was being assisted up off the ground, Officer Minurka heard him say something to the effect of "I ran because I had weed on me." Tr. 1, at 53. Officer Giancursio confirmed hearing the same. See Tr. 2, at 61. According to Officer Minurka the statement was not made in response to any direct question. Tr. 1, at 53.

Officer Giancursio conducted a pat down search of Tillard. Tr. 1, at 55; Tr. 2, at 62. He found "an assortment of marijuana on his person." Tr. 2, at 62. Once Officer Giancursio secured Tillard in a patrol vehicle, he searched the area where Tillard had been apprehended. Tr. 2, at 62. He found a "Sig Sauer 9mm handgun right where the defendant had made his motions," about eight to ten feet from where Tillard had been. Tr. 2, at 27, 62-63, 79. Officer Giancursio testified that the "thud" he heard was consistent with the sound of a gun hitting the ground. Tr. 2, at 63. Although there was snow on the ground, Officer Giancursio testified that the gun did not appear to have any snow on top of it. Tr. 2, at 64. The weapon recovered was not loaded. Tr. 2, at 67-68. When Officer Minurka returned to secure the Toyota Camry, he discovered Sherry Kitchens, the mother of Tillard's child, sitting in the passenger seat. Tr. 1, at 77.

Officer Minurka conducted a post-arrest interview of Tillard in his patrol vehicle. Tr. 1, at 55-56. Tillard was handcuffed in the backseat of Officer Minurka's patrol car directly behind the driver's seat where Officer Minurka was sitting. Tr. 1, at

5

56-57. Officer Minurka advised Tillard of his Miranda rights verbatim from his rights waiver card. Tr. 1, at 58-59. Tillard admitted to using marijuana earlier in the day but denied being under the influence of marijuana at the time of the interview. Tr. 1, at 58. Tillard indicated that he understood his rights. Tr. 1, at 60. The interview lasted approximately 45 minutes. Tr. 1, at 62.

According to Officer Minurka, while interviewing an arrested individual in his patrol vehicle "is sometimes not the standard [procedure]," he did so because Tillard was "very eager" to speak to him based on their previous law enforcement interactions. Tr. 1, at 62; see Tr. 1, at 75. Officer Minurka explained that he first came to know Tillard when he responded to the scene of a shooting in which Tillard was the victim. Tr. 1, at 75-76; Tr. 2, at 47. They met on several occasions thereafter during the course of Officer Minurka's police business, including during several traffic stops Officer Minurka conducted on Tillard. Tr. 1, at 76; Tr. 2, at 5-7. Officer Minurka was trying to develop Tillard as an "informant" which, according to Officer Minurka, Tillard had expressed interest in. Tr. 1, at 82-83; Tr. 2, at 49. Officer Minurka had texted Tillard from his personal cellphone on at least two occasions as Tillard had given Officer Minurka his cellphone number. Tr. 1, at 81; Tr. 2, at 9-10. Tillard did not respond to text messages Officer Minurka sent on November 2 and November 4, 2016. Tr. 2, at 11. Officer Minurka thought Tillard had responded

6

on other occasions but did not have any documentation or text messages as proof. Tr. 2, at 11. Officer Minurka explained their relationship as "completely voluntary." Tr. 1, at 70.

In explaining the events that preceded his arrest, Tillard told Officer Minurka that

> he saw a gentleman in a black SUV that he had recognized that robbed and shot him [in] prior months. . . . [He] exited the vehicle with a handgun, walked towards that SUV with the intent to threaten or flash the gun . . . [H]e initially said he cocked the gun . . . indicating he racked the slide to see if there was a round had [sic] chambered in the firearm, which there wasn't. Once he realized that there was no magazine and no bullets, he decided to turn back towards his vehicle, at which point I think he indicated that he saw our police car. He got in his vehicle and began to drive away. . . . knowing that we were going to stop him. He fled on foot, and I think he used the word pitched . . . the gun.

Tr. 1, at 62-63. Tillard indicated he wanted to provide a written statement, although there were "certain things that he did not want inside that written statement." Tr. 1, at 65. Officer Minurka told Tillard he could put whatever he wanted in the statement "as long as it's the truth." Tr. 1, at 65.

A substantial segment of the suppression hearing focused on the officers' use of their body-worn cameras ("BWCs").[2] Neither

---

[2] Tillard filed a complaint against Officer Minurka with the PSS of the RPD on December 21, 2017 alleging a "pattern of harassment starting approximately six months [before] and culminating in and including the arrest in this case." Tr. 1 at 6, 16. Defense counsel demanded a copy of the PSS file as exculpatory impeachment material required to be disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. The government initially resisted disclosure but eventually agreed to produce a copy of the requested materials for in camera review by the Court. On January 25, 2019, after the Court reviewed the materials, a hearing was held on disclosure. The Court ruled from the bench as to disclosure of each disputed document. See Docket # 55. After disclosure was made, the suppression hearing continued and the defense was able to fully use the disclosed PSS materials in its cross-examination of the officers.

Officer Minurka nor Officer Giancursio turned on their BWC at any point during this incident. Tr. 1, at 72, 86; Tr. 2, at 85. Officer Minurka testified that it was unusual for him not to be wearing his BWC but could not recall whether he was wearing it or not at the time of Tillard's arrest. Tr. 1, at 86-87. At the time of Tillard's arrest, Officer Minurka was unclear on the policy for when he needed to turn his BWC on. Tr. 1, at 88-89. Officer Minurka believed that he was not supposed to turn his BWC on inside any RPD buildings and thought that same policy would apply to an interaction inside his patrol vehicle. Tr. 1, at 89. He also did not believe that he was required to "record an interview based on a mere possession of a firearm." Tr. 2, at 29. He and Officer Giancursio both received a "counseling memorandum" from the RPD stating that they were in violation of the RPD's BWC policy as a result of this incident. Tr. 1, at 72; Tr. 2, at 85-86. Officers Minurka and Giancursio admitted that they had had their BWCs for less than 30 days at the time of this incident and that they "made a mistake" in not using their BWCs. Tr. 1, at 73; Tr. 2, at 66, 88.

## Discussion

In his initial motion papers, Tillard sought to suppress (1) his statement to the effect of "I ran because I had weed on me"; (2) the oral and written statements he made to Officer Minurka in the back of his patrol vehicle; and (3) the marijuana discovered

in his jacket pocket.[3] Def's. Mem. in Supp. of Mot. to Suppress (Docket # 65), at 1-2. At the conclusion of the suppression hearing, the Court directed defense counsel to file a letter brief on what issues should be addressed in this Report and Recommendation. Tr. 2, at 93-94. On August 28, 2019, counsel filed the letter brief. See Docket # 65. The primary issue raised by the defense is the perceived lack of credibility of Officers Minurka and Giancursio. Id. The government filed a response to the defense's brief on September 11, 2019. See Docket # 67.

The Stop of Tillard: Tillard's argument that the officers lacked reasonable suspicion or probable cause to make a traffic stop (see Docket # 65, at 2-3) is without merit. An automobile stop must be reasonable under the circumstances to satisfy the Fourth Amendment. Whren v. United States, 517 U.S. 806, 810 (1996). For an automobile stop to be reasonable, the officer making the stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005); see Terry v. Ohio, 392 U.S. 1, 21 (1968). In this case, the reason

---

[3] The defense also moves to suppress "another statement Tillard was alleged to have made in RPD Officer Jason Barton's patrol vehicle while in custody and being transported from the scene of his arrest to the Monroe County Jail." Docket # 65, at 2. It does not appear that the government intends to use any such statement as it is not contained in any of the notices of intent to use evidence the government filed (Docket ## 41, 51, 58) and the government presented no evidence of such statement at the motion hearing. The defendant does not move to suppress the firearm found at the scene of his arrest. Accordingly, the Court does not address suppression of the firearm or the statement allegedly made to Officer Barton.

9

for the traffic stop was observed violations of New York's Vehicle and Traffic Law. Both officers testified that they observed the defendant drive erratically and evasively at a high rate of speed and activate his turn signal while he had already commenced the process of making a turn.[4] Tillard's conduct, at a minimum, violated section 1163(b) of New York's Vehicle and Traffic Law which provides that a "signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning." See United States v. Fernandez-Jimenez, No. 03Cr.1493(RPP), 2004 WL 1598653, at *3 (S.D.N.Y. July 16, 2004) (officers' observation that vehicle turned without using turn signal justified traffic stop). The officers therefore had probable cause to initiate a traffic stop.

Once Tillard quickly exited the Toyota Camry and ran from the scene of the traffic stop, the officers gave chase and observed behaviors that permitted the seizure and subsequent arrest of the defendant. The defendant's flight from police and throwing motion provided reasonable suspicion sufficient to stop and frisk the defendant. See United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006) ("When the noticed presence of officers provokes a

---

[4] The defense contends that Officer Minurka also stopped Tillard because he knew that Tillard only had a valid learner's permit and he could not see anyone else in the car that would allow Tillard to be driving lawfully. Docket # 65, at 3. Because the Court finds probable cause existed to stop the Toyota Camry for the defendant's failure to signal 100 feet before a turn, the Court need not address any other justification for the stop.

suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a Terry stop is warranted."); United States v. Samuel, No. 09-CR-128A(Sr), 2010 WL 1644253, at *4 (W.D.N.Y. Apr. 7, 2010) ("[T]he defendant's unprovoked flight at a high rate of speed, the defendant's failure to heed the officers' assertion of authority and the observation of Lieutenant Kwiatkowski and Lieutenant Bartoszewicz of the defendant reaching out the window and throwing a handgun over the top of the vehicle with his left hand, are more than sufficient to establish reasonable suspicion to pursue the defendant and that the defendant's subsequent seizure (arrest) was supported by probable cause."). As the officers were assisting Tillard up from the ground after the foot-chase, Tillard volunteered that he ran because he "had weed" on his person. This admission provided additional justification for the search that confirmed his possession of marijuana and provided ample probable cause for his arrest.

Search of the Defendant: Searches incident to a lawful arrest are a long-recognized exception to the warrant requirement. United States v. Diaz, 854 F.3d 197, 205 (2d Cir. 2017). Because Tillard's seizure by arrest was lawful, so too was the search of his person incident to his arrest. Any evidence seized as a result of the defendant's arrest is therefore not subject to suppression as the fruit of an illegal search.

11

The Defendant's Statements:   The test for determining whether the conduct of law enforcement agents amounted to "interrogation" is whether the words or actions of law enforcement agents "were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980). Thus, the term "interrogation" includes both express questioning or its functional equivalent and includes any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." Id. at 300-02. In making this assessment, the Court must consider "the totality of the circumstances of the agents' conduct." United States v. Cota, 953 F.2d 753, 758 (2d Cir. 1992). The determination of whether a statement is likely to elicit an incriminating response "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301. Generally, however, "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997) (internal quotations and citations omitted). Here, both officers testified that Tillard's statement about having weed on him was entirely spontaneous and not in response to any direct question. Considering the testimony adduced at the hearing, and the totality of circumstances surrounding the stop and arrest of the defendant, I conclude that

Tillard's statement to the effect of "I ran because I had weed on me" was volunteered and not the result of custodial interrogation.

As to the remaining statements, Officer Minurka testified that he read the defendant his Miranda rights prior to conducting the post-arrest interview in his patrol car. The evidence presented by the government at the hearing convinces me that Tillard's statement was fully voluntary and not coerced. Having been caught possessing a gun and drugs, Tillard affirmatively tried to leverage his knowledge of criminal activity into leniency for his own criminal conduct. Indeed, the prior relationship between Officer Minurka and Tillard supports this finding. Hence, I find that any statements the defendant made or signed in Officer Minurka's patrol vehicle after his arrest were made subsequent to Miranda warnings and were fully voluntary.

Credibility of Witnesses: Tillard contends that the officers' testimony regarding this entire encounter is not worthy of belief. The factual findings I have set forth above obviously indicate that I found Officers Minurka and Giancursio's testimony to be credible on the factual findings material to this Report and Recommendation. In reaching this conclusion, I have not only considered my first-hand observations of the officers' testimony on both direct and cross-examination, but also the allegation that the officers' decisions to not activate their BWCs were intentional and resulted in the issuance of counseling memoranda. Indeed, the defense asks the Court to "incorporate an adverse inference

13

regarding the credibility of the government's witnesses" given the officers' failure to activate their BWCs in violation of RPD policy. Docket # 65, at 6. In the defense's view, "law enforcement in this case failed to preserve evidence in contravention of its own directives, thereby depriving Mr. Tillard of access to potentially exculpatory information and his right to present a defense." Docket # 65, at 6.

But "non-compliance with department policy, without more, [does] not justify suppression" where an officer fails to activate his BWC prior to attempting to make a traffic stop. See United States v. Griffin, 18-cr-100-pp, 2018 WL 4929397, at *4 (E.D. Wis. Oct. 11, 2018). While each case has unique facts, courts that have addressed this issue have generally declined to make an adverse credibility finding as a result of non-compliance with BWC activation policies. See id.; United States v. Taylor, 312 F. Supp. 3d 170, 178 (D.D.C. 2018) ("In this case, [Officer] Logan had been issued his body-worn camera less than six months before his involvement in Taylor's arrest. . . . Nor is there any basis to believe that Officer Logan engaged in any misconduct at the scene, such as planting or mishandling evidence, or that he failed to activate the camera in order to hide or to obscure evidence. Rather, Taylor's sole contention is that Officer Logan and others should have taken affirmative steps to preserve additional evidence. Under these circumstances, the Court concludes that his failure to activate his body-worn camera does not constitute

14

prima facie evidence of bad faith in failing to collect and preserve additional evidence."); United States v. Brown, No. 17-CR-58, 2017 WL 8941247, at *15-16 (D. Nev. Aug. 14, 2017) (finding no bad faith on part of officer in failing to record search of the defendant and noting that "body cameras are new devices that officers . . . are still getting acclimated to using" and that as cameras "become more pervasive, and their use more ingrained in the culture and day-to-day routines of police officers, the Court cannot say that the absence of video evidence in violation of internal police procedures can never be suspicious or suggestive of misconduct" (internal quotations omitted)); cf. United States v. Gibson, 366 F. Supp. 3d 14, 26-27 (D.D.C. 2018) (finding "[b]y failing to adhere to MPD policy and activate their body-worn cameras, the MPD officers deprived the Court from reviewing the best evidence available" but declining to find bad faith by noting that "[t]he Court need not infer that the MPD officers were intentionally not activating their body-worn cameras" and granting suppression on other grounds (emphasis in original)).

To be sure, there may be situations where "the lack of recording might tip the balance in favor of a defendant's version of events in a close case." Griffin, 2018 WL 4929397, at *4 (finding that "the absence of a recording, standing alone, does not support discrediting unrefuted testimony.") (internal quotations omitted). Here, however, there was evidence and logical inferences made from that evidence that, in the Court's view,

15

sufficiently corroborated Officers Minurka and Giancursio's version of events. For these reasons, I decline to reject Officer Minurka's and Officer Giancursio's testimony or adopt an adverse inference as to their overall credibility.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that the defendant's motion to suppress evidence and statements (Docket # 42) be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: October 4, 2019
Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**</u>

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

/s/ Jonathan W. Feldman
Jonathan W. Feldman
United States Magistrate Judge

Dated:   October 4, 2019
         Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).