UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

Case # 18-CR-6091-FPG

DECISION AND ORDER

ROBERT E. TILLARD,

Defendant.

## INTRODUCTION

On December 7, 2018, Defendant moved to suppress statements he made and physical evidence seized during an attempted traffic stop followed by his arrest. ECF No. 42. United States Magistrate Judge Jonathan W. Feldman issued a report and recommendation (R&R) on October 4, 2019 recommending that the Court deny Defendant's motion to suppress. ECF No. 71. Currently before the Court are Defendant's objections to the R&R, which were filed on December 6, 2019. ECF No. 78. For the following reasons, the Court ADOPTS Judge Feldman's R&R in full. Defendant's motion to suppress is DENIED.

## BACKGROUND

On October 16, 2018, the Grand Jury returned a three-count indictment charging Defendant Robert E. Tillard with various offenses relating to possession of marijuana with intent to distribute and unlawful possession of a firearm. ECF No. 35. The Grand Jury returned a similar superseding indictment on October 8, 2019. ECF No. 75. Judge Feldman held an evidentiary hearing on Defendant's motion to suppress on December 12, 2018, which was continued on August 5, 2019. ECF Nos. 53, 64. At the evidentiary hearing, Rochester Police Department Officers Peter Minurka

1

and Sam Giancursio testified. ECF No. 53 at 39–40; ECF No. 64 at 3, 56. Defendant did not call any witnesses at the evidentiary hearing. ECF No. 64 at 93.

On February 25, 2017, Officers Minurka and Giancursio were patrolling a "high-crime area" in their patrol vehicle. ECF No. 53 at 41–42, 53–54. That evening, both officers witnessed Defendant drive fast and evasively and commit a traffic violation by failing to activate his turn signal 100 feet prior to beginning a turn. ECF No. 53 at 47–48; ECF No. 64 at 59–60; N.Y. Veh. & Traf. Law § 1163(b). Officer Minurka initiated a traffic stop using his emergency lights and siren. ECF No. 53 at 48; ECF No. 64 at 60. Defendant, however, did not pull over and continued down the street until he reached a dead end, at which point Defendant jumped out of his vehicle and fled on foot. ECF No. 53 at 48–50; ECF No. 64 at 60.

Officers Giancursio and Minurka pursued Defendant. ECF No. 53 at 51; ECF No. 64 at 60. During the chase, both officers witnessed Defendant make a throwing motion and Officer Giancursio heard a thud. ECF No. 53 at 52; ECF No. 64 at 61. Shortly thereafter, Officer Giancursio apprehended the Defendant. ECF No. 53 at 52; ECF No. 64 at 61. As Officer Giancursio was escorting Defendant back to the patrol vehicle, both officers heard Defendant spontaneously attribute his flight to marijuana he had in his possession. ECF No. 53 at 53; ECF No. 64 at 61–62. In addition to the marijuana that was discovered in Defendant's possession, Officer Giancursio also discovered a handgun in the area where Defendant made a throwing motion. ECF No. 64 at 62–63.

Officer Minurka conducted a post-arrest interview of Defendant in the patrol vehicle. ECF No. 53 at 55–57. Officer Minurka was in the front seat and Defendant was handcuffed in the back seat of the vehicle directly behind Officer Minurka. *Id.* Officer Minurka testified that he read Defendant his *Miranda* rights and that Defendant both stated he understood those rights and agreed

to speak with Officer Minurka even with those rights in mind. *Id.* at 58–61. Officer Minurka further testified that during the course of the (approximately) forty-five-minute interview Defendant made an oral statement and signed a written statement. *Id.* at 62–68.

Officer Minurka explained that the Defendant was "very eager" to speak with him—potentially because of their prior relationship. *Id.* at 62. Prior to Defendant's arrest, Officer Minurka responded to a shooting, and Defendant was the victim. *Id.* at 74–76. In the course of investigating the shooting, Officer Minurka spoke with Defendant on multiple occasions. *Id.* Officer Minurka also stopped Defendant a total of six times over the course of five months, including the day before Defendant's arrest. *Id.* at 76–77; ECF No. 64 at 4–7. On several occasions, he conducted searches of Defendant and discovered marijuana, but he never arrested or charged Defendant. ECF No. 64 at 7–9. Officer Minurka also sent Defendant at least two text messages from his personal phone to which Defendant did not respond. *Id.* at 9–11. Officer Minurka described his relationship with Defendant as "completely voluntary," "cordial," and "good." ECF No. 53 at 70; ECF No. 64 at 45.

During the relevant events, both officers violated department policy by failing to activate their body-worn cameras. ECF No. 53 at 72, 86; ECF No. 64 at 64–65, 85. Both officers testified that the cameras were new to them. ECF No. 53 at 73, 86; ECF No. 64 at 65–66. Officer Giancursio thought he activated his camera, but he failed to do so. ECF No. 64 at 64–65. Officer Minurka testified that he forgot to activate his camera during the initial pursuit of Defendant and that his understanding of department policy was that the camera should not be activated while he interviewed Defendant in the patrol vehicle. ECF No. 53 at 72–73, 87–89; ECF No. 64 at 29–31.

Following his arrest, Defendant's relationship with Officer Minurka apparently soured. Defendant filed a complaint against Officer Minurka with the Rochester Police Department's

Professional Standards Section on December 21, 2017. ECF No. 53 at 6–7. Defendant alleged a "pattern of harassment" by Officer Minurka culminating in Defendant's arrest. *Id.* at 16–17. Although the complaint did not result in discipline for Officer Minurka, both Officers Minurka and Giancursio received a counseling memorandum for their failure to activate their body worn cameras the night of Defendant's arrest. *Id.* at 72; ECF No. 64 at 32–33, 41–42, 85, 90.

## LEGAL STANDARD

A district court reviews those portions of a R&R to which a party has timely objected *de novo*. Fed. R. Crim. P. 59(b)(3). When a party does not object to a portion of a R&R, a party's objections are conclusory or general, or a party repeats arguments made to the magistrate judge without identifying a specific error in the judge's reasoning, a district court reviews those portions for clear error. *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009); *see also* Fed. R. Crim. P. 59(b)(2); Loc. R. Crim. P. 59(c)(2) ("Written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."); *Alvarez Sosa v. Barr*, 369 F. Supp. 3d 492, 497 (E.D.N.Y. 2019) ("[O]bjections that simply reiterate the original arguments, without identifying a specific error in the report and recommendation, *e.g.*, why a specific finding or conclusion is faulty or the magistrate judge erred in rejecting a specific argument, are reviewed under the clear error standard."). After reviewing the R&R and the objections to it, a district court "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3).

## DISCUSSION

Judge Feldman found that (1) Officers Minurka and Giancursio had probable cause to make the traffic stop of Defendant; (2) that Defendant was searched incident to his lawful arrest; (3) that

Defendant's statement to the effect of "I ran because I had weed on me" was voluntary (i.e., it was not the result of custodial interrogation); (4) further statements were made subsequent to *Miranda* warnings and were fully voluntary; and (5) that the officers' testified credibly and their failure to turn on their body-worn cameras did not warrant an adverse inference against the officers' truthfulness and suppression. ECF No. 71 at 9–16.[1]

Defendant argues that Judge Feldman erred in crediting Officer Minurka's and Officer Giancursio's testimony. ECF No. 78 at 2. Judge Feldman already found Defendant's argument unavailing. Because Defendant has not specifically addressed flaws in Judge Feldman's reasoning, but instead has simply reasserted most of his arguments, Defendant is entitled only to clear error review. *Barr*, 369 F. Supp. 3d at 497.

Even if Defendant were entitled to *de novo* review, however, the Court would still adopt Judge Feldman's R&R. A district court will ordinarily accept a magistrate judge's credibility findings and should not reject them without holding its own evidentiary hearing. *United States v. Lawson*, 961 F. Supp. 2d 496, 499–500 (W.D.N.Y. 2013); *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008).

Defendant points out that the Government's case rests "entirely on the credibility of . . . Officers Minurka and Giancursio," but conversely, Defendant's entire argument rests on discrediting the testimony of Officers Minurka and Giancursio. ECF No. 78 at 3. Defendant points to no evidence to contradict their testimony. A third party was present during the traffic stop, Ms.

---

[1] Judge Feldman also declined to address the suppression of an additional statement Defendant allegedly made in a third officer's patrol vehicle. ECF No. 71 at 9 n.3. Judge Feldman declined to address the statement because it was not contained in any of the Government's notices of intent to use evidence, ECF Nos. 41, 51, 58, and the Government did not present evidence of the statement at the hearings on the motion to suppress. ECF No. 71 at 9 n.3. The Government does not intend to use the statement. ECF No. 67 at 4. Defendant notes that Judge Feldman did not address his objection to the use of this statement but does not argue that Judge Feldman erred in doing so. ECF No. 78 at 1 n.1. The Court agrees with Judge Feldman's approach.

Sherry Kitchens, the mother of Defendant's child. ECF No. 53 at 77. Ms. Kitchens was in the passenger seat of Defendant's vehicle when he was pulled over. *Id.* Neither Ms. Kitchens nor the Defendant testified to a conflicting account of the relevant events.

Although the Government generally bears the burden of proof by a preponderance of the evidence if it has searched or seized an individual without a warrant,[2] Defendant has not cited any cases in which a court has suppressed evidence based solely on facts tending to discount the weight of government evidence or the credibility of government witnesses. *See United States v. Gomez*, 877 F.3d 76, 81, 84, 96–98 (2d Cir. 2017) (noting that district court did not err in crediting consistent testimony of a police detective and DEA agent over contradictory affidavit of defendant, who did not testify, even though there was evidence the detective gave at least some false testimony). If a defendant only attacks the credibility of the government's witnesses or the weight of the government's evidence and does not present contradictory testimony or evidence, it is difficult to say that the government has not carried the day via a preponderance of the evidence presented. *See, e.g.*, *Preston*, 635 F. Supp. 2d at 271. Defendant would need to demonstrate that the relevant portions of the Government's evidence were not worthy of belief. *See Gomez*, 877 F.3d at 97 (finding no error in crediting portions of detective's testimony that were consistent with other evidence presented without crediting portion of testimony that was inconsistent).

Even assuming Defendant could prevail without presenting contradictory evidence, Defendant's arguments regarding the officers' credibility are unpersuasive. Specifically,

---

[2] *United States v. Dunnigan*, 17-CR-119, 2019 WL 5257572, at *4 (W.D.N.Y. Oct. 17, 2019) ("On a motion to suppress evidence, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. If the defendant meets that initial burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not contravene the Fourth Amendment. Thus, when the government has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted." (internal quotations, alterations, and citations omitted)).

Defendant argues that the officers are not credible because: (1) the officers were biased by Defendant's complaint against Officer Minurka that resulted in both officers receiving a counseling memorandum; (2) the officers' testimony is unreliable; and (3) the officers did not activate their body-worn cameras during the relevant time frame. ECF No. 78 at 2.

I.  **There is No Evidence the Complaint and Counseling Memorandum Biased Testimony**

Defendant claims that both officers were biased by Defendant's complaint against Officer Minurka that resulted in the Rochester Police Department's Professional Standards Section issuing a "counseling memorandum" to both officers. Defendant made the complaint nearly ten months after the traffic stop, so it played no part in the traffic stop, arrest, and search of Defendant. ECF No. 53 at 6–7, 41. Further, there is no evidence that either officer altered his account of what happened once they became aware of the complaint and were issued the counseling memorandum. ECF No. 64 at 54–55. Accordingly, there is no evidence that the complaint and counseling memorandum biased the officers' uncontradicted testimony.

II. **The Officers' Testimony Appears Reliable**

Defendant argues that the officers' uncontradicted testimony is unreliable because: (1) no traffic citations were issued for all of the traffic violations arguably committed to by Defendant; (2) since Defendant knew he was being followed by police, it is not believable that he failed to activate his turn signal 100 feet before he began to turn; (3) it is not believable that Officer Minurka had a "good" or "cordial" relationship with Defendant; (4) Officer Minurka deviated from the normal procedure by questioning Defendant in the back of the patrol vehicle instead of taking Defendant to an interrogation room with recording equipment; (5) it is not believable that Defendant would spontaneously say something to the effect of "I ran because I had weed on me" after being apprehended; and (6) it is not believable that Defendant, a young, black male, would

have been eager to speak to Officer Minurka, a white male, while handcuffed in the back of the patrol vehicle. ECF No. 78 at 3–5.

Defendant has provided no explanation as to why a police officer exercising discretion to ticket some, but not all, potential traffic offenses impinges on the officer's credibility. The Court sees no reason why it should discount the officers' uncontradicted testimony based on this fact.

Defendant's failure to activate his turn signal in a timely manner is consistent with his efforts to flee from the police officers he knew were following him. The uncontradicted testimony demonstrates that Defendant was driving fast and evasively. ECF No. 53 at 47–48; ECF No. 64 at 59–60. It is unsurprising that Defendant might forget to timely activate his turn signal.

There is no basis to conclude that Officer Minurka misrepresented his relationship with the Defendant. Defendant did not file a complaint based on Officer Minurka's conduct until after his arrest. ECF No. 53 at 6. Further, the record suggests that Officer Minurka extended Defendant a great deal of leniency and was attempting to cultivate Defendant as an informant. ECF No. 64 at 7–9, 51. It is plausible that Defendant and Officer Minurka had a "good" or "cordial" relationship until Defendant's arrest.

Officer Minurka's relationship with Defendant also provides a plausible reason for him to deviate from normal practice to interview Defendant in the patrol vehicle instead of an interrogation room. Defendant has presented no evidence that this practice violated department policy or that it is uncommon for officers to forgo an interrogation room in favor of a patrol vehicle if a suspect is eager to cooperate.

Finally, Defendant fails to address Judge Feldman's cogent explanation for Defendant's cooperation. ECF No. 71 at 13 (noting that the Defendant "affirmatively tried to leverage his knowledge of criminal activity into leniency for his own criminal conduct"). Additionally,

Defendant's spontaneous statement regarding the marijuana that was in his possession is easily explained as an effort to direct the officers' attention away from the gun that he allegedly threw. Officer Minurka testified that he had stopped Defendant multiple times previously and caught him with marijuana and related paraphernalia but did not charge the Defendant. ECF No. 64 at 5–8, 53. The Defendant was never discovered to be in possession of a weapon on any of those prior stops. *Id.* at 53–54. The handgun distinguishes this attempted traffic stop, where Defendant fled, from Officer Minurka's prior stops of Defendant, where he did not flee. It is unsurprising that the Defendant might hope Officer Minurka would again extend leniency for marijuana possession, while simultaneously fearing that the leniency would not extend to his possession of the handgun.

Defendant cites *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), for the proposition that black males in Boston, Massachusetts are disproportionately targeted by law enforcement for police-civilian encounters. *Id.* at 342. The court explained that black males in Boston may flee law enforcement for innocuous reasons and courts should be cognizant of that in weighing flight in analysis of reasonable suspicion. *Id.* It is unclear how the court's decision in *Warren* is relevant here. There is no dispute that the facts outlined by Judge Feldman support probable cause for Defendant's arrest. The only question is whether the officers' account is credible. The Supreme Judicial Court of Massachusetts did not suggest that white police officers cannot be trusted if they claim a black male cooperated while in custody or that it is impossible for a white police officer to have a cordial relationship with a black male. Defendant has failed to provide a reason Judge Feldman should have disregarded the officers' uncontradicted testimony.

### III. The Officers' Failure to Activate Their Body-Worn Cameras Does Not Warrant Suppression

Defendant argues that the officers' failure to turn on their body-worn cameras is the "most significant[]" factor warranting suppression. ECF No. 78 at 5. Defendant argues that this failure is

tantamount to a failure to preserve evidence and violates his due process rights and also impinges on the credibility of the officers. *Id.* at 7. For the government to commit a due process violation in failing to preserve evidence, the defendant must show bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it."). The Court finds no evidence of bad faith on the part of the officers. Other courts have held that police officers' failure to activate body-worn cameras alone does not constitute a due process violation. *United States v. Taylor*, 312 F. Supp. 3d 170, 178 (D.D.C. 2018) (no due process violation where police officer failed to turn on body-worn camera, in contravention of department policy, while investigating apartment); *United States v. Brown*, No. 2:17-CR-58, 2017 WL 8941247, at *15–16 (D. Nev. Aug. 14, 2017) (no due process violation where three officers failed to record various relevant events, but the court noted that, as body-worn cameras become more ingrained in the day-to-day routines of police officers, it could not "say that the absence of video evidence in violation of internal police procedures c[ould] never be suspicious or suggestive of misconduct"), *adopted by* 2018 WL 451556 (D. Nev. Jan. 16, 2018).

With respect to the officers' credibility, their failure to activate their body-worn cameras does not render their testimony unreliable. There is no dispute that the officers violated department policy by failing to activate their cameras before they exited their vehicle to pursue the Defendant. ECF No. 64 at 31–32, 84. The record, however, provides no evidence that the officers were required to activate their body-worn cameras before Defendant's alleged traffic violation, which justified the traffic stop. Accordingly, it is unclear how the body-worn camera footage would have impacted the analysis with respect to the lawfulness of the stop itself.

Further, Judge Feldman found that Defendant did not pull over when Officer Minurka initiated the traffic stop, but instead continued toward a dead end, stopped his car, and then "exited [the vehicle and fled] in a full sprint." ECF No. 71, at 4. Defendant has made no specific objection to this finding. It is not surprising that, in pursuing a suspect fleeing at "a full sprint" these officers would fail to turn on their body-worn cameras. *See United States v. Gori*, 230 F.3d 44, 55 (2d Cir. 2000) ("[C]ourts 'should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.'") (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).[3] Further, both officers explained that they had their cameras for thirty working days or less. ECF No. 53 at 73, 86; ECF No. 64 at 38–39, 66; *see Taylor*, 312 F. Supp. 3d at 178 (noting officer had been issued body-worn camera only six months before relevant events); *Brown*, 2017 WL 8941247, at *16 (noting that "body cameras are new devices that officers . . . are still getting acclimated to using").[4]

*United States v. Griffin*, which was cited by Judge Feldman but not addressed by Defendant, is instructive. No. 18-CR-100, 2018 WL 4929397 (E.D. Wis. Oct. 11, 2018). In that case, two police officers claimed that they initiated a traffic stop after witnessing the defendant commit a traffic violation. *Id.*, at *4, *6. Defendant argued that the officers' testimony was not credible based on their failure to activate their body-worn cameras in contravention of department policy. *Id.* at *5. The court even found that one of the officers had a habit of failing to activate his body-worn camera. *Id.* The court, however, declined to reject the officers' testimony because there

---

[3] Officer Minurka even explained that this was the first instance he was required to activate his body-worn camera during a foot chase. ECF No. 53 at 73, 86. Officer Giancursio attempted to activate his body-worn camera but did not correctly activate the device. ECF No. 64 at 65. He did not realize his mistake until after Defendant was in custody. *Id.*

[4] Defendant also cites Officer Minurka's decision not to activate his body-worn camera during his interview of Defendant in the patrol vehicle. ECF No. 78 at 4. Officer Minurka attributed this decision to his understanding of department policy. ECF No. 53 at 87–89; ECF No. 64 at 29–31.

was no evidence the second officer had a habit of failing to turn on his camera, that officer adequately explained his reason for failing to activate his camera, both officers testified consistently, and defendant presented no contradictory testimony. *Id.* at *6. Similarly here, both officers explained their reasons for failing to activate their cameras and offered consistent testimony and Defendant did not present contradictory testimony.

Defendant cites *United States v. Yevakpor*, for the proposition that the Court should grant his motion to suppress to protect Defendant's due process right. 419 F. Supp. 2d 242 (N.D.N.Y. 2006). In *Yevakpor*, the court examined three short, "cherry-picked" video segments. *Id.* at 246–47, 252. A U.S. Customs and Border Patrol supervisor ordered the preservation of the three clips, but not the preceding, intervening, or succeeding footage. *Id.* at 246–47. It would have been relatively easy and inexpensive to preserve the entire video, but instead, the government expended greater time and effort to preserve only the three clips. *Id.* The court found "sufficient bad faith to warrant" suppression of the three clips. *Id.* at 247, 251.

Here, the officers have plausibly explained their failure to turn on their body-worn cameras, but the government could not plausibly explain its failure in *Yevakpor* to preserve all of the relevant footage. The Government here is also not seeking to admit only a "cherry-picked" portion of body-worn camera footage. Accordingly, a much more severe remedy would be required than that imposed by the court in *Yevakpor*. In *Yevakpor*, the government was free to present witnesses who could testify regarding the videotaped events, *id.* at 251, but here, Defendant seeks to exclude statements and evidence the officers obtained while their body-worn cameras were off. Such a remedy is not warranted here.

Finally, Defendant cites the oral ruling of the Honorable Thomas E. Moran of the New York Supreme Court for the County of Monroe on November 21, 2019 in *People v. Hawkins*, No.

2019-0482. ECF No. 78 at 7–9; ECF No. 78-1. In that case, the court conducted a probable cause hearing regarding a July 24, 2019 foot chase. ECF No. 78-1 at 3, 9, 15–16. Rochester Police Department Officers Michael Montillaro and Jeremy Lindauer approached a group of five to six males sitting on a lawn. *Id.* at 4, 7, 11. One of the men stood up and began to flee. *Id.* at 14–15. The officers pursued and detained the fleeing man and recovered a handgun and marijuana. *Id.* at 15–16. Both officers failed to activate their body-worn cameras. *Id.* at 16–17, 24–25. Only Officer Montillaro testified. *Id.* at 25–26. The court concluded that it could not accept Officer Montillaro's testimony as "truthful and accurate" because of a pattern it had witnessed regarding officers' failure to activate their body-worn cameras in cases involving apprehensions. *Id.* at 28.

Defendant argues that this Court should follow the oral ruling in *Hawkins* and find that the officers' testimony here is not credible. ECF No. 78 at 8–9. Importantly, the incident in *Hawkins* occurred over two years after the incident at issue here (Defendant was arrested on February 25, 2017). ECF No. 53 at 41–42, 53–54. The officers in *Hawkins* had a much longer period of time to familiarize themselves with their body-worn cameras. Further, this Court has not been confronted with a similar pattern of Rochester Police Department officers failing to activate their body-worn cameras. In fact, Officer Minurka testified that, since this incident, there have only been a handful of times he has forgotten to active his body-worn camera and he has "been in a hundred percent compliance" in Rochester Police Department random audits of his body camera usage. *Id.* at 73–74; ECF No. 64 at 42–43. This Court is reticent to discount the consistent and uncontroverted testimony of Officers Minurka and Giancursio where there is no evidence they have a habit of failing to activate their body-worn cameras. *See Griffin*, 2018 WL 4929397, at *5–6.

Accordingly, Defendant has not shown that Judge Feldman erred in crediting the testimony of the officers here. The Court has reviewed the remainder of Judge Feldman's R&R for clear error and has found none.[5]

## CONCLUSION

For the foregoing reasons, the Court ADOPTS Judge Feldman's R&R, ECF No. 71, in full, Defendant's motion to suppress, ECF No. 42, is DENIED.

IT IS SO ORDERED.

Dated: January 6, 2020
Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[5] Defendant attempts to incorporate by reference the legal arguments he previously made to Judge Feldman. ECF No. 78 at 1–2. Although it appears that Defendant made the same arguments in both contexts, Defendant's incorporation is insufficient to warrant *de novo* review. *See, e.g.*, *Barr*, 369 F. Supp. 3d at 497.

14